Patricia REECE; and Willard David
Reece, Appellants/Cross–
Appellees,

v.

DIXIE WAREHOUSE AND CARTAGE
COMPANY, n/k/a Dixie Warehouse
and Cartage Company, LLC, Appel-
lee/Cross–Appellant.

Nos. 2004–CA–000652–MR,
2004–CA–000682–MR.

Court of Appeals of Kentucky.

March 10, 2006.

Freeda M. Clark, Louisville, KY, for appellants/cross-appellees.

Ted Kozak, Catherine M. Sewell, Louisville, KY, for appellee/cross-appellant.

Before BARBER and JOHNSON, Judges; MILLER, Senior Judge.[1]

## OPINION

JOHNSON, Judge.

Patricia Reece and Willard David Reece have appealed from the judgment entered by the Jefferson Circuit Court on December 29, 2003, confirming the jury award in favor of the Reeces. Dixie Warehouse and Cartage Company, LLC has filed a cross-appeal arguing that the trial court erroneously credited Patricia's workers' compensation benefits award only to her lost wages, rather than the entire judgment. We affirm the trial court's judgment as to all issues.

Dixie Warehouse is in the business of leasing merchandise storage space. Pur-

---

1. Senior Judge John D. Miller sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statutes (KRS) 21.580.

suant to a storage agreement, Fawn Engineering Company contracted with Dixie Warehouse to store vending machines on its premises. Fawn employed RGIS Inventory to inventory its vending machines stored at Dixie Warehouse on a monthly basis and to record the serial numbers which appeared on the documents located at the top of each vending machine.[2] Patricia had worked approximately ten years for RGIS, when she was sent to Dixie Warehouse on October 23, 1998, to inventory Fawn's vending machines. On this visit, Patricia was injured after falling three and one-half feet off a loading dock ("the drop-off"), and landing on the rails of a railroad track which ran the distance of the warehouse. Patricia sustained several injuries including multiple pelvic fractures, injury to her back, bladder, ankle, and arm. As a result of her injuries, Patricia claimed to suffer severe depression and anxiety, and testified that she had been disabled ever since the injury, except for one brief unsuccessful attempt to return to work in 1999.

The majority of the facts of this case are heavily disputed, especially as to the open and obvious nature of the drop-off and Patricia's knowledge of the drop-off prior to her injury. Patricia testified that before the date of the accident she had only been to Dixie Warehouse on one prior occasion for approximately 30 minutes, while she was doing inventory for Fawn. Patricia testified that on the date of the accident Dixie Warehouse's Building One supervisor, Matt Hileman, accompanied her to the location of the vending machines at the front of the warehouse, moved the machines, and read the numbers to her for her to write down.

Conversely, William Piccolo, Patricia's supervisor, testified that Patricia had been the sole person assigned to the Fawn account for close to one year, and that she had visited Dixie Warehouse eight or nine times before the date of the accident. Hileman testified that Patricia had been to Dixie Warehouse at least two times prior to October 23, 1998. Hileman's testimony was corroborated by Sue Ellen Warner, Patricia's co-worker. She testified that she had gone with Patricia to Dixie Warehouse on two occasions prior to October 23, 1998.[3]

On October 23, 1998, when Patricia arrived at Dixie Warehouse she spoke with Hileman; and he instructed another Dixie Warehouse employee, Arthur Rheaume, to accompany Patricia to the vending machines. Patricia testified that Rheaume was instructed to read the numbers on the machines to her so she could write them down. Patricia and Rheaume proceeded down a long hallway, toward the vending machines. Along the hallway, there were pallets of merchandise stacked six to eight feet high on each side. Patricia testified that on the date of the accident, unlike on the first occasion, the vending machines were located at the back of the warehouse. However, Hileman testified that the vending machines had always been stored at the back of the warehouse.

Patricia testified that Rheaume indicated to her that he did not know what he was looking for on the vending machines,

---

**2.** The numbers were located on either the front, back, or side of the vending machines.

**3.** Though Warner's testimony was contradictory between the time of her deposition and trial, it was proper for the jury to determine her credibility and the weight to be given to her testimony. *See Birdsong v. Wal–Mart* *Stores, Inc.*, 74 S.W.3d 754, 758 (Ky.App. 2001) (stating, "[a]s in all cases involving questions of fact, the weight to be given to conflicting evidence and the credibility to be afforded each witness remains within the province of the jury" [citations omitted] ).

and at that point, Patricia attempted to show him by looking up at a vending machine for the card with the serial number on it. Rheaume denied that he asked Patricia for assistance. Patricia testified that at this point, prior to writing down any serial numbers, she fell from the drop-off. However, Rheaume testified that Patricia had already inventoried two machines before she fell and that she was reading the numbers and writing them down when she fell. Patricia testified that the vending machines were positioned right at the edge of the drop-off. This was supported by the testimony of Elizabeth Cummins, an employee of RGIS, who inventoried for Fawn in February 1999, after Patricia's injury.

Patricia testified that she did not know about the drop-off on the date of her accident and that she had not seen the drop-off on her previous visit to Dixie Warehouse. Hileman testified that he had assisted Patricia on prior occasions in order to keep her away from the dock. He testified that he did not remember mentioning the drop-off to Patricia on these occasions. However, Rheaume testified that he warned Patricia several times on the date of the accident to be careful and not to step too close to the drop-off. Further, Warner testified that Patricia had actually warned her about the drop-off on the occasions they visited Dixie Warehouse together prior to the accident.

The adequacy of the lighting in the area of Dixie Warehouse where Patricia was injured is important to a determination of liability in this case.[4] While there was extensive testimony in the case that the area was dimly lit, there was also considerable evidence that the drop-off was still visible.[5] Hileman testified that the drop-off was visible from 50 feet and stated that "it's a big hole." This testimony was corroborated by Joe Bennett, Dixie Warehouse's safety and training manager, who also described the drop-off as "huge," a "large entity," and "big." Dixie Warehouse offered testimony from Bill Rueff, an expert in the field of industrial lighting. He testified that the lighting met the standard for an inactive area of the warehouse, but testified that he could not express an opinion about the amount of light at the drop-off spot, considering factors such as inventory and persons present that would have diminished the measurements.

Piccolo testified that the area around the drop-off "was dimly lit . . . and there was a faint yellow line painted on the end of the dock . . . three or four inches [wide]." However, he testified that he could see his feet, the edge of the rail deck, and the railroad tracks below. Cummins testified to the poor lighting conditions on the dates of her visits to Dixie Warehouse during 1999; and stated that on one occasion, a Dixie employee used a flashlight to help her read the numbers. She further testified that the rail dock area was not visible until a person was right on top of it. However, she testified that a person could look down and see her feet, and when walking toward the machines on the dock,

4. *Downing v. Drybrough*, 249 S.W.2d 711, 712 (Ky.1952).

5. Joe Bennett, Dixie Warehouse's safety and training manager, testified that the accident happened in a warehouse space consisting of 33,600 square foot, including the rail well area. Within that space were five mercury vapor lights at 400 watts each, and 53–dual bulb light units at 95 watts for each bulb, installed on the ceiling which was 19 to 20 feet above the warehouse floor. The lights were all functioning at the time of the accident. There were also two skylights, four feet in diameter, located in the ceiling. He testified that the mercury vapor lights and the sky lights directly illuminated the area where Patricia fell.

a person would be able to see because of the sunlight coming in from either side. She further testified that the worst visibility was between the machines and was limited from three to four feet. This testimony was corroborated by Warner.

Both Cummins and Warner testified that they did not see a yellow stripe along the edge of the drop-off. However, there was a video taken of the scene, which was submitted to the jury, not on the issue of lighting, but to demonstrate the physical surroundings of the area where Patricia fell. The videotape showed the aisle way only a few feet wide leading up to the drop-off and it revealed a faint yellow stripe along the edge of the drop-off.

Dixie also offered testimony of Brian White, an employee of Jefferson County EMS, who gave Patricia medical attention at the scene. He testified that he had sufficient lighting to treat Patricia at the site of the drop-off.

On September 30, 1999, the Reeces filed a complaint against Dixie Warehouse in the Jefferson Circuit Court alleging that Patricia was injured as a result of the negligence of Dixie Warehouse and its employees in failing to warn her of a dangerous, latent condition which was a substantial factor of her fall and injury.[6] The Reeces argued that Patricia should be awarded compensatory damages, and that Willard, Patricia's husband, should be awarded damages based on his claim of loss of consortium. On August 7, 2002, Dixie Warehouse filed a motion for summary judgment, arguing that it did not breach any duty owed to Patricia and that her injuries were entirely caused by her own negligence. On August 12, 2002, the Reeces filed a motion for partial summary judgment, arguing that it was an undisputed fact that the drop-off was not open and obvious, and thus the only factual issue for the jury to decide was whether Patricia had knowledge or should have had knowledge of the drop-off prior to the accident.

On February 6, 2003, the trial court entered an opinion and order denying both the Reeces's motion and Dixie Warehouse's motion for partial summary judgment on the issue of whether the hazard was open and obvious.[7] The trial court stated that "the proof on this issue is controverted, so much that the Court cannot make a factual determination ..." and "[w]hile the applicable law is clear, the facts are hotly contested."

The case proceeded to a jury trial beginning on December 2, 2003, and ending on December 10, 2003. At the close of the evidence, the Reeces moved for a directed verdict on the question of whether the hazard was open and obvious, which was denied. The trial court instructed the jury, in relevant part as follows:

### INSTRUCTION NO. 1

"Ordinary care" as applied to [Patricia], means such care as the jury would expect an ordinarily prudent person to exercise under similar circumstances.

---

6. It is well-established that to establish liability for negligence the plaintiff must prove: (1) a duty; (2) a breach of that duty; (3) which was the proximate cause of an injury; and (4) which resulted in damages. All of these elements are essential to a valid claim. *See Illinois Central Railroad v. Vincent,* 412 S.W.2d 874, 876 (Ky.1967); and *Helton v. Montgomery,* 595 S.W.2d 257, 258 (Ky.App. 1980).

7. In its order, the trial court identifies both the Reeces's and Dixie Warehouse's motions as being motions for a partial summary judgment. However, Dixie Warehouse's motion was actually for summary judgment *in toto.* This is the only order the trial court entered regarding Dixie Warehouse's summary judgment motion.

"Ordinary care" as applied to [Dixie Warehouse], means such care as the jury would expect ordinarily prudent persons engaged in the same type of business to exercise under similar circumstances.

## INSTRUCTION NO. 2

It was the duty of [Dixie Warehouse], through its employees to exercise ordinary care to maintain the warehouse premises in a reasonably safe condition, including the duty to warn others of dangerous conditions that are not open and obvious. You will find for [Patricia] and against [Dixie Warehouse] if you are satisfied from the evidence that [Dixie Warehouse] failed to comply with the duties under this Instruction, and that such failure was a substantial factor in causing [Patricia's] fall and injury. Otherwise, you will find for [Dixie Warehouse].

QUESTION:

Are you satisfied from the evidence that [Dixie Warehouse] failed to comply with its duties under Instruction No. 2, and that such failure was a substantial factor in causing [Patricia's] fall and injury?

YES _____ NO_____

If you have answered "NO" to the Question under Instruction No. 2, then you have found for [Dixie Warehouse] and you shall return to the courtroom. If you have answered "YES," proceed to Instruction No. 3.

## INSTRUCTION NO. 3

It was the duty of [Patricia], on October 23, 1998, to exercise ordinary care for her own safety. If you have answered "YES" to the Question under Instruction No. 2, finding [Dixie Warehouse] failed to comply with its duties, but are also satisfied from the evidence that [Patricia] failed to comply with her duty under this Instruction, and that such failure was a substantial factor in causing her fall and injuries, then you shall indicate in the blank spaces below what percentage of total fault was attributable to each party. In determining the percentage of fault, you shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between its or her conduct and the damages claimed.

PLAINTIFF _____%
DEFENDANT _____%

TOTAL 100%

The jury returned a verdict finding that both Dixie Warehouse and Patricia had breached their duties to exercise ordinary care, resulting in Patricia's injury, and the jury apportioned 73% of the fault to Patricia and 27% to Dixie Warehouse.[8] The trial court entered a judgment confirming this verdict on December 29, 2003.

On January 8, 2004, the Reeces filed a motion for a new trial or, in the alternative, for a judgment notwithstanding the verdict for the full amount of the verdict without apportionment. On February 19, 2004, Dixie filed a response and a "counterclaim for judgment notwithstanding the

---

**8.** The total damages assigned to Patricia were in the sum of $91,457.63, broken down as follows:

$40,916.00—Physical and mental pain and suffering .
$25,958.30—Past lost wages
$24,583.33—Destruction of ability to earn money

The jury assigned Willard $4,000.00 for loss of services and companionship. The jury's apportionment of fault resulted in Patricia and Willard receiving only 27% of the total damages, specifically $17,684.82 and $1,080.00, respectively.

verdict," claiming that the trial court erred in giving credit for Patricia's receipt of $64,348.41, in workers' compensation benefits only to the lost wages portion of the verdict, instead of the entire verdict. Oral arguments were held on February 23, 2004, and the trial court denied all the motions by opinion and order entered on March 9, 2004. This appeal and cross-appeal followed.

The Reeces argue to this Court (1) that the trial court erred in denying their motion for summary judgment because Dixie Warehouse's judicial admissions left no question of fact as to whether the drop-off was open and obvious, leaving only a question as to Patricia's knowledge of the drop-off; and (2) that the instructions to the jury were erroneous because they did not require the jury, prior to apportioning damages, to make specific findings as to whether the drop-off was open and obvious, and as to whether or not Patricia was aware, or should have been aware, of it. Dixie Warehouse's sole argument on its cross-appeal is that the trial court failed to give full credit for the workers' compensation benefits in the amount of $64,348.41, paid to Patricia under KRS 304.36–120 of the Kentucky Insurance Guaranty Act, which would result in a zero verdict.

The Reeces argue that statements made by Dixie Warehouse's witnesses in pre-trial depositions and at trial were judicial admissions that required a summary judgment [9] or directed verdict [10] that the drop-off was not open and obvious,[11] "dis-

9. The standard for summary judgment analysis is set forth in Kentucky Rules of Civil Procedure (CR) 56 and is interpreted by *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky.1991) (noting that the court must view the evidence "in the light most favorable to the non-moving party" and award summary judgment only where there are no genuine issues of material fact that would make it possible for the non-moving party to prevail at trial. The non-moving party has the duty to produce "at least some affirmative evidence that there are issues of fact." "The trial judge must examine the evidence, not to decide any issue of fact, but to discover if a real issue exists"). *See also Welch v. American Publishing Co. of Kentucky*, 3 S.W.3d 724, 730 (Ky.1999) (stating that "[t]he inquiry should be whether, from the evidence of record, facts exist which would make it possible for the non-moving party to prevail. In the analysis, the focus should be on what is of record rather than what might be presented at trial").

10. *See Bierman v. Klapheke*, 967 S.W.2d 16, 18 (Ky.1998) noting that a directed verdict may only be granted when "there is a complete absence of proof on a material issue...." The Court further noted that an appellate court may not reverse a trial court's decision in this area absent clear error. This issue was properly presented to the jury by the court's instructions, and in fact the jury found that Patricia was 73% at fault. *See Wal–Mart Stores, Inc. v. Lawson*, 984 S.W.2d 485, 489 (Ky.App.1998) (citing *Jones v. Winn–Dixie of Louisville, Inc.*, 458 S.W.2d 767 (Ky. 1970)).

11. This testimony included the following: Bennett acknowledged that Dixie Warehouse had a policy of escorting persons to the site in the warehouse where they needed to conduct business and warned of the drop-off for reasons of general safety and company security. These policies were both verbal and written and included dealings with inventory personnel. He also testified that Dixie Warehouse conducted regular safety meetings. Bennett testified that he considered the drop-off "inherently dangerous" and that while it was open and obvious, invitees should still be warned of its existence. He further testified that new employees were walked over to the drop-off site and shown its existence; this testimony was corroborated by Hileman. He further testified that he doubted that Patricia could see the drop-off from where she was standing. William Whitson, warehouse supervisor, testified that all visitors were accompanied by personnel due to safety conditions, including the drop-off. He further testified that he always looked at the backside of the products and tried to keep an invitee on the inside away from the drop-off. He also testi-

pens[ing] with the necessity of . . . producing evidence on the issue of latency of the drop-off." The Reeces argue in their brief that "[c]ertainly, there can be no clearer indication of the lack of obviousness and openness of the drop-off that caused [Patricia's] injury than [Dixie Warehouse's] own conduct in requiring visitors be accompanied in the area, and be specifically alerted to and shown the existence of the drop-off, and in its specifically demonstrating the presence of drop-off to its own new employees."

▮ "A judicial admission is a formal act by a party in the course of a judicial proceeding which has the effect of waiving or dispensing with the necessity of producing evidence by the opponent and bars a party from disputing a proposition in question" [citations omitted].[12] Whether a statement is a judicial admission is a question of law, which is reviewed *de novo*, "without deference to the interpretation afforded by the circuit court." [13]

▮ While judicial admissions are not to be taken lightly, they "should be narrowly construed." [14] In order for trial testimony to rise to the level of a judicial admission it must be " 'deliberate and unequivocal and unexplained or uncontradicted' " [citations omitted].[15] The conclusiveness of a judicial admission should be determined " 'in the light of all the conditions and circumstances proven in the case' " [citations omitted].[16] This is necessary in order to determine "the probability of error in the party's own testimony." [17] The Court in *Elpers v. Kimbel*,[18] stated as follows:

> "Testimony in court is an elusive matter of mental operations. It is the culmination of much talk and reflection[.] . . . The truth of the case depends on a comparison of what all the witnesses say and all the circumstances indicate. A rule which binds a party to a particular statement uttered on the stand becomes an artificial rule. It is out of place in dealing with testimony. Let the judge test each case by itself" [citations omitted].

The Reeces contend that the statements by Dixie Warehouse as to the effort it took to warn of the drop-off established that it recognized its duty, but in doing so failed to act reasonably.[19] The trial court stated

fied that he always cautioned visitors regarding the drop-off.

12. *Nolin Production Credit Association v. Canmer Deposit Bank*, 726 S.W.2d 693, 701 (Ky. App.1986). *See also Goldsmith v. Allied Building Components, Inc.*, 833 S.W.2d 378, 380 (Ky.1992).

13. *Cinelli v. Ward*, 997 S.W.2d 474, 476 (Ky. App.1998).

14. *Lewis v. Kenady*, 894 S.W.2d 619, 622 (Ky. 1994). *See also Goldsmith*, 833 S.W.2d at 380 (stating that "[m]anifestly, the determination by a court that a party may not contradict an admission is strong medicine and should be sparingly administered. . . . [The rule] 'should be applied with caution because of the variable nature of testimony and because of the ever present possibility of honest mistake' " [citations omitted] ).

15. *Bell v. Harmon*, 284 S.W.2d 812, 815 (Ky. 1955).

16. *Hamby v. University of Kentucky Medical Center*, 844 S.W.2d 431, 436 (Ky.App.1992).

17. *Sutherland v. Davis*, 286 Ky. 743, 151 S.W.2d 1021, 1024 (1941).

18. 366 S.W.2d 157, 163–64 (Ky.1963).

19. We find Dixie Warehouse's argument persuasive that public policy should encourage business owners to warn business invitees of possible dangers, regardless of either's duty or the visible nature of the danger. Dixie Warehouse argues, "[i]f this conduct amounts to a judicial admission of negligence, the courts would then be in the anomalous position of encouraging businesses to say nothing and let visitors freely roam their premises."

in its March 9, 2004, opinion that such statements by Dixie Warehouse were "simply not the type of unequivocal statements contemplated by this doctrine." The trial court referenced the case of *Lambert v. Franklin Real Estate Co.,*[20] in which there were judicial admissions as to the open and obvious nature of the hazard but the court still held that a directed verdict was premature.[21] The trial court stated: "The facts in the case at bar are not remotely as conclusive as those presented in *Lambert, supra,* and therefore, the Court can find no error in its denial of a motion for a directed verdict."

Our Supreme Court has stated that the obviousness of a hazard may be an issue of fact depending upon the facts of the particular case.[22] While statements were made by Dixie Warehouse's witnesses that they made sure visitors were aware of the location of the drop-off, they also testified that the drop-off was large and noticeable. Thus, the testimony presented by Dixie Warehouse indicated that it was not acquiescing as to the duty to warn, but did so out of caution.

■■■ Because of the conflicting testimony on the obviousness of the drop-off as a hazard and Patricia's knowledge thereof, the issue of whether the drop-off was open and obvious was a proper question for the jury. Evidence was presented that while the area was not well lit, the drop-off was plainly visible. On the other hand, there was also testimony that because of the lighting and lack of clear marking, the drop-off was not open and obvious. We have examined the record and conclude that issues of material fact existed and that there was sufficient evidence upon which the jury could determine that the drop-off was open and obvious. Therefore, the trial court properly denied the Reeces's motion for a partial summary judgment and their motion for a directed verdict, as there was a genuine issue as to a material fact.

The Reeces's second argument is that the jury instructions were erroneous because they permitted the jury to apportion fault against Patricia, an invitee, even if the jury believed that the drop-off was not open and obvious and that Patricia was unaware of the drop-off. The Reeces state in their brief, "since the law does not require [Patricia], as an invitee, to be on the look-out for latent (not 'open and obvious') dangers, these instructions, on the point described above, were erroneous, imposing a greater duty on [Patricia] than the law provides."

■■■ Appellate review of jury instructions is a matter of law and, thus, *de novo.* "Instructions must be based upon the evidence and they must properly and intelligibly state the law." An instruction's function is " 'only to state what the jury must believe from the evidence ... in order to return a verdict in favor of the party who bears the burden of proof' " [citations omitted].[23]

■■■ "Each party to an action is entitled to an instruction upon his theory of the case if there is evidence to sustain it" [citations omitted].[24] However, Ken-

Dixie further argues that such actions by business owners should "be applauded, and not penalized by an inappropriate application of the doctrine of judicial admissions." We agree.

**20.** 37 S.W.3d 770 (Ky.App.2000).

**21.** *Id.* at 775.

**22.** *Schreiner v. Humana, Inc.,* 625 S.W.2d 580, 581 (Ky.1981).

**23.** *Howard v. Commonwealth,* 618 S.W.2d 177, 178 (Ky.1981).

**24.** *Farrington Motors v. Fidelity & Casualty Co. of New York,* 303 S.W.2d 319, 321 (Ky. 1957).

tucky law requires that jury instructions be limited to the "bare bones," and not include "an abundance of detail," but rather, provide a "skeleton [that] may then be fleshed out by counsel on closing argument."[25] These skeletal instructions should not include specifically enumerated duties.[26] The instructions should accurately and adequately "submit the applicable law relating to the issues in the controversy for the guidance of the jury in arriving at a just and proper verdict" [citations omitted].[27] However, the language used in jury instructions should not "over-emphasize an aspect of the evidence or amount to a comment on the evidence" [citations omitted].[28]

It is undisputed that Patricia was an invitee of Dixie Warehouse at the time of her injury.[29] Designating Patricia as an invitee (versus trespasser or licensee) determined the scope of duty owed to her by Dixie Warehouse as the owner or occupier of the premises, *i.e.*, "the duty to exercise reasonable care in the circumstances."[30]

▪ "There is no duty to warn an invitee concerning open and obvious conditions[.]"[31] "Obvious" is defined as meaning "that both the condition and the risk are apparent to and would be recognized by a reasonable man in the position of the visitor exercising ordinary perception, intelligence and judgment" [citations omitted].[32] As applied to the facts of this case, there was a jury question as to whether the drop-off presented an open and obvious hazard. If the jury determined that the danger was open and obvious, Dixie Warehouse owed Patricia no duty and its negligence would not be an issue.[33] If the jury determined that the condition was not open and obvious, Dixie Warehouse was required to maintain its business in a reasonably safe condition and was under a duty to exercise reasonable care to discover artificial or natural conditions which involved an unreasonable risk to Patricia, and either correct them or to warn of the peril.[34]

▪ Regardless of whether the drop-off was open and obvious, Patricia, as an invitee on Dixie Warehouse's premises, had a duty to exercise ordinary care for her own safety, and could not walk blindly into dangers that are obvious, known to her, or would be anticipated by one of ordinary prudence,[35] which is generally a question of fact for the jury.[36] Patricia admitted in her testimony that she was not looking down when she stepped off the platform. A person does not have to "look directly down at [her] feet with each step

25. *Hamby*, 844 S.W.2d at 433.

26. *Id.*

27. *Shewmaker v. Richeson*, 344 S.W.2d 802, 806 (Ky.1961).

28. *McKinney v. Heisel*, 947 S.W.2d 32, 34 (Ky.1997).

29. See *Cozine v. Shuff*, 378 S.W.2d 635, 637 (Ky.1964).

30. *Perry v. Williamson*, 824 S.W.2d 869, 875 (Ky.1992).

31. *Shipp v. Johnson*, 452 S.W.2d 828, 830 (Ky.1969).

32. *Bonn v. Sears, Roebuck & Co.*, 440 S.W.2d 526, 529 (Ky.1969).

33. *Corbin Motor Lodge v. Combs*, 740 S.W.2d 944, 946 (Ky.1987).

34. *City of Madisonville v. Poole*, 249 S.W.2d 133, 135 (Ky.1952).

35. *Smith v. Smith*, 441 S.W.2d 165, 166 (Ky. 1969). See also *Wilkinson v. Family Fair, Inc.*, 381 S.W.2d 626, 628 (Ky.1964).

36. *Silverman v. Bowman*, 411 S.W.2d 906, 908 (Ky.1967).

taken but, in the exercise of ordinary care for [her] own safety, one must observe generally the surface upon which [she] is about to walk." [37]

■■■■ " 'Ordinarily, the question whether the injury was caused solely by the defendant's negligence, or was contributed to by plaintiff, should be left to the jury.... The duty to make reasonable use of faculties to observe and discover conditions of danger is included within the duty to exercise ordinary care to avoid injury' " [citations omitted].[38] The trial court properly gave an ordinary care instruction.

■■■■ KRS 411.182(1) requires apportionment instructions "[i]n all tort actions" involving the alleged fault of more than one party. Where there is sufficient evidence to support a finding of fault of a party, an apportionment instruction must be given if requested.[39] In the case before us, there was a great deal of testimony as to the factual issues concerning whether the drop-off was open and obvious, the significance of the warnings given to Patricia, the sufficiency of the lighting around the drop-off, and Patricia's own knowledge of the existence of the drop-off. Such evidence supported an apportionment instruction.

The jury was instructed that both parties had a duty to exercise ordinary care and it determined both Patricia and Dixie Warehouse had breached their duties to some extent. The Reeces argue that because the open and obvious issue was not set out in a separate instruction, it is impossible to determine whether the jury determined that the hazard was not open and obvious. This argument is refuted by the jury's finding Dixie Warehouse at

fault. For Dixie Warehouse to be found even partially at fault, it had to have a duty to Patricia; and Instruction No. 2 provided that its duty to exercise ordinary care to maintain the premises in a reasonably safe condition only applied to dangerous conditions that were not open and obvious. Thus, by finding that Dixie Warehouse failed to comply with its duty to exercise ordinary care, the jury found that the drop-off was not open and obvious. Otherwise, Dixie Warehouse would have had no duty and thus no liability.

The Reeces also erroneously argue that if the jury found that the drop-off was not open and obvious, it is impossible to determine whether it believed that Patricia had any knowledge of the drop-off. Again, it is clear that the jury did believe Patricia had knowledge or should have had knowledge of the drop-off, because it found that she was at fault and, thus, breached her duty to exercise ordinary care for her own safety. Since the jury verdict apportioned fault to Patricia, it is not possible to construe the verdict in a way that does not include a finding that Patricia either had knowledge of the drop-off, or should have had such knowledge.

The jury clearly could have found that while Dixie Warehouse had a duty to warn of the drop-off, that it did so to a certain extent, but that any negligence by Dixie Warehouse was not the sole substantial cause of the injury. There was conflicting testimony as to how many times Patricia had been to Dixie Warehouse prior to the date of the accident. The jury could have also concluded from the evidence that Patricia had prior knowledge of the drop-off, as there was testimony that the drop-off

**37.** *Humbert v. Audubon Country Club,* 313 S.W.2d 405, 407 (Ky.1958).

**38.** *O.K. Tire Store #3, Inc. v. Stovall,* 392 S.W.2d 43, 44 (Ky.1965).

**39.** *Stratton v. Parker,* 793 S.W.2d 817, 820 (Ky.1990).

could be seen from 50 feet away and other RGIS employees could see it when they were on the premises, that she was warned by Dixie Warehouse employees of the drop-off, and that Patricia had warned a co-worker of the hole at the site days before the accident occurred. These disputed facts were clearly for the jury, and the jury made findings within the range of proof.

We find no error in the instructions given in this case. In simple terms, the jury was asked to make the factual determination of whether the placement of the drop-off was such that the danger it posed was, or should have been, obvious to Patricia, and whether she exercised ordinary care. The instructions were in conformity with applicable law.

 In Dixie Warehouse's cross-appeal, it argues that the trial court misapplied the law of KRS 304.36–120. Our review of the interpretation of a statute is *de novo*, because it is a matter of law.[40] In the trial court's judgment entered on December 29, 2003, it stated as follows:

In entering the Judgment set forth below, the Court has reviewed the briefs filed by the parties in this case. The Court has found that [Dixie Warehouse], was insured by the Reliance Insurance Company. On October 3, 2001, the Commonwealth Court of Pennsylvania, ordered the liquidation of the Reliance Insurance Company and appointed the Insurance Commissioner of the Commonwealth of Pennsylvania to be the Liquidator of Reliance. Included in that Order was a finding by the Court that the Reliance Insurance Company was found to be insolvent under the terms of Pennsylvania law. The liquidation and the finding of insolvency triggers the application of the Kentucky Insurance Guaranty Act under KRS 304.36–010, *et seq.* Under the Act, the Kentucky Insurance Guaranty Association becomes obligated to pay a "covered claim" against an insolvent insurer in an amount not exceeding $300,000.00. KRS 304.36–080(1)(a).

The Court further finds that KRS 304.36–120[41] does not allow a duplication of recovery where insurance benefits have been paid. The Act specifically holds that any person having a claim against an insurer under any provision in an insurance policy other than the policy of an insolvent insurer, which is also a covered claim, shall be required to first exhaust his rights under the policy. Any amount payable on a covered claim under this subtitle shall be reduced by the amount of the recovery under the insurance policy. KRS 304.36–120 defines any provision in an insurance policy as including, but is not limited to the following coverages: [b]asic reparation benefits under KRS Chapter 304, Subtitle 39, uninsured motorists, underinsured motorists, workers' compensation and health care.

The Court in rendering the following Judgment has also considered the [a]ffida-

---

**40.** *Wheeler & Clevenger Oil Co., Inc. v. Washburn*, 127 S.W.3d 609, 612 (Ky.2004).

**41.** KRS 304.36–120(1) states as follows:

Any person having a claim against an insurer under any provision in an insurance policy other than the policy of an insolvent insurer which is also a covered claim shall be required to exhaust first his right under the policy. Any amount payable on a cov-

ered claim under this subtitle shall be reduced by the amount of recovery under the insurance policy. Any provision in the insurance policy includes, but is not limited to, the following coverages: basic reparation benefits under KRS Chapter 304, Subtitle 39; uninsured motorist; underinsured motorist; workers' compensation; and health care.

vit of Walter Harding, the workers['] compensation attorney for [Patricia's] employer, RGIS [ ]. This [a]ffidavit indicates that the workers' compensation carrier paid $64,348.41 in temporary total disability benefits to [Patricia] from October 23, 1998, until August 28, 2002. Accordingly, the Court finds that [Dixie Warehouse] is entitled to a credit for this amount against the award for lost wages, rendering the award to be zero dollars.

Dixie Warehouse argues that the KIGA Act calls for an offset against Dixie Warehouse's total liability, for all insurance benefits that Patricia received. The entire judgment for the Reeces was $95,457.63. Based upon the jury's apportionment of fault, Dixie Warehouse was required to pay 27% of that sum, or $25,473.56. Patricia's workers' compensation carrier paid her benefits in the amount of $64,348.41. The trial court in an effort to prevent Patricia from receiving a double recovery, applied this amount to the lost wages portion of the verdict, $25,958.20, and ordered Dixie Warehouse to pay 27% of the remaining total of the verdict, $17,684.82 to Patricia and $1,080.00 to Willard.

Dixie Warehouse, in its response to the Reeces's motion for judgment notwithstanding the verdict, filed a "counterclaim for judgment not withstanding the verdict" that if the trial court granted the Reeces's motion, that it requested that the full amount of Reeces's workers' compensation benefit award be credited to reduce the entire verdict to zero. The trial court entered an order on March 9, 2004, stating as follows:

> [Dixie Warehouse] has couched its motion in conditional terms and has not tendered a proposed Order. Therefore, it appears that [Dixie Warehouse] only wishes the Court to consider its motion for a zero verdict should it be inclined to grant that [motion] brought by [Patricia]. The Judgment tendered by [Dixie Warehouse] and entered by this Court on December 29, 2003, accurately states the current state of the law....

> IT IS HEREBY ORDERED AND ADJUGED that both [Patricia's and Dixie Warehouse's] motions for judgment notwithstanding the verdict and/or for a new trial are DENIED.

Based on the language used by Dixie Warehouse in its "counterclaim," this Court has serious doubts that it has adequately preserved this issue for appeal. Regardless, we are not persuaded by its argument.

Dixie Warehouse acknowledges in its brief that there is no Kentucky precedent to support its claim that credit should be applied against the entire verdict. Rather, it relies on foreign authorities to support its view. Dixie Warehouse argues that this Court in *Hawkins v. Kentucky Insurance Guaranty Assoc.*,[42] did not distinguish between the kind of benefits received and the kind of injuries sustained, therefore an offset must be against the total liability. We are not persuaded that *Hawkins* supports the proposition that workers' compensation benefits can be applied to any part of the jury award other than lost wages. We conclude that to do so would be contrary to the intent of the statute.

For the foregoing reasons, the judgment of the Jefferson Circuit Court is affirmed.

ALL CONCUR.

---

42. 838 S.W.2d 410 (Ky.App.1992).