Donald W. BUCKLER, Appellant,

v.

Terri L. MATHIS, Appellee.

No. 2010–CA–000828–MR.

Court of Appeals of Kentucky.

July 22, 2011.

Perry R. Arnold, Bedford, KY, for appellant.

William P. Swain, Patricia L. Harmeling, Ben T. White II, Louisville, KY, for appellee.

Before KELLER and LAMBERT, Judges; SHAKE,[1] Senior Judge.

## OPINION

LAMBERT, Judge:

This is an appeal from a defense verdict in a personal injury action following a jury trial. Donald W. Buckler, the plaintiff below, contends that he is entitled to a new trial due to errors concerning the jury instructions and due to the striking of a portion of his treating physician's deposition. Having carefully reviewed the record and the applicable caselaw, we affirm.

On September 1, 2005, Buckler was involved in a motor vehicle accident that occurred when Terri L. Mathis was improperly turning left across his lane of travel. Buckler, who was driving a 2003 Chevy TrailBlazer SUV, attempted to avoid the collision by applying his brakes, but the front ends of the two vehicles impacted. As a result of the accident, Buckler claimed he sustained injuries to his hands, arms, back, neck, and shoulders. While the injuries to his back, neck, and shoulders resolved, Buckler continued to have problems with his hands and arms, and sought medical treatment.

On August 6, 2007, Buckler filed a complaint in Henry Circuit Court alleging that Mathis negligently caused the motor vehicle accident which caused him to sustain permanent injuries to his hands and arms as well as a shock to his nervous system. He sought damages for his medical treatment as well as pain and suffering.

The parties engaged in discovery, and a jury trial was scheduled for April 21, 2009. The trial court also imposed a set of pretrial compliance dates. The trial date was later rescheduled for June 2, 2009. Compliance dates were reset to align with the new trial date. On May 22, 2009, the trial court remanded the June 2 trial date and scheduled the trial for an alternate date on September 9, 2009. However, the trial court specifically did not extend the deadlines for any pretrial compliance. The parties litigated several issues by means of motions *in limine*, including whether insurance or Buckler's employment could be mentioned.

Pertaining to this appeal, on May 26, 2009, Mathis objected to portions of the deposition of treating physician Dr. Robert Jacob taken by Buckler on February 20, 2009. Mathis contended that Buckler's questioning of Dr. Jacob regarding the permanency of his injuries improperly asked him to assume information that was not in evidence regarding physical therapy and was speculative in nature. In response to the question, Dr. Jacob indicated that he would have to verify the information concerning Buckler's current condition by physical examination. In response and in addition to addressing the merits of the objection, Buckler argued that Mathis's objection was untimely and that Mathis failed to object during the deposition.

1. Senior Judge Ann O'Malley Shake sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statutes (KRS) 21.580.

On September 10, 2009, the trial court ruled in favor of Mathis on Dr. Jacob's testimony, stating that the physician:

was unable to give a medical opinion based upon a reasonable degree of medical probability as to permanency (affecting the issue of future medical expenses), when he *qualified his answer* with the condition that his opinion would depend upon his verification of Plaintiff's complaints by physical examination. No physical examination was ever done, and while Plaintiff in deposition has asserted the existence of limited range of motion and that he attended "physical therapy," to allow Dr. Jacobs' [sic] opinion based on that testimony is to allow the jury to "be the doctor" and perform its own evaluation of the patient. The Court does not find that Plaintiff is able to offer any proof in that regard.

Based upon this ruling, the trial court excluded Buckler's claim for future medical expenses from the trial. The same day, the trial court continued the trial until October 27, 2009, and permitted Buckler to take additional testimony from Dr. Jacob regarding permanency of his injury to establish his claim for future pain and suffering.

The matter proceeded to trial on October 27 and October 28, 2009. At trial, Buckler testified about the circumstances of the accident and the resulting injuries he sustained, as well as the effect the injuries have had on his life. Regarding the accident, Buckler stated that he was gripping the steering wheel with both hands, and he described his right index finger as going back upon impact. He described the pain as excruciating and throbbing. Buckler also reported that pain in his back and neck cleared up over the course of three to four weeks. Buckler maintained that he had never had any problems with his left hand, but that he later developed a vascular problem with his left index finger unrelated to the accident, as diagnosed by Dr. Jacob. Buckler also complained of a knot that developed on his wrist. He stated that he obtained a splint for his finger and had continued with daily exercises he learned in physical therapy. Finally, Buckler admitted that he had sustained an injury to his right index finger in October 2002 when that finger hyperextended while he was working with a horse. Believing that he had broken the finger, he sought treatment from Dr. Kenneth Gardner. There was no fracture in the finger, and Buckler stated that he never had any additional problems related to the horse incident. Buckler's wife and son also testified about the accident's effect on his quality of life.

For medical proof, Buckler introduced the deposition testimony of Dr. Jacob. Dr. Jacob is an orthopedic surgeon who first saw Buckler on December 7, 2005, on referral by family physician Dr. Damon Gatewood. During the first visit, Dr. Jacob took a history of the car accident and Buckler complained of bilateral wrist and hand pain. He also reviewed diagnostic x-rays and performed a physical examination. Dr. Jacob's working diagnosis was right and left wrist sprain, which would be consistent with the history of the motor vehicle accident. Dr. Jacob next (and for the last time) saw Buckler on June 21, 2006, for continued complaints of pain in both upper extremities, including pain, stiffness, and swelling in his right index finger as well as problems with gripping and grasping related to his left wrist.

On cross-examination, Dr. Jacob testified that Buckler showed evidence of Raynaud's disease in his left hand, which he did not attribute to the motor vehicle accident. Raynaud's disease is a vascular disorder that causes sensitivity to cold. Dr. Jacob also stated that Buckler had not

reported a previous injury to his right index finger in October 2002. He stated that an earlier injury could possibly have contributed to scarring on that finger. Finally, Dr. Jacob stated that he had not treated Buckler since June 21, 2006, had not placed any restrictions on him, had never told him he could not work, and could not express an opinion as to whether he sustained a permanent injury.

Medical records of Dr. Gatewood, Dr. Jacob, and Family Physician Associates were also introduced.

Buckler first sought treatment from Dr. Gatewood on September 19, 2005, several weeks after the motor vehicle accident. At that time, he complained of left wrist, right hand, lower back, and neck pain since the time of the accident. The notes reflect that his wrist and hand pain had worsened over the last week. Dr. Gatewood ordered x-rays of the cervical spine (which showed mild disc space narrowing at C6–7, but no acute findings), the left wrist, left hand, right hand, and lumbar spine. No fractures were identified in any of the x-rays. Buckler followed up with Dr. Gatewood on November 30, 2005, for continued complaints of left wrist pain and the development of a knot on his wrist. The physical examination revealed that the left wrist and left index finger were tender. Dr. Gatewood ordered repeat x-rays of the left wrist, which were again normal. He then referred Buckler to Bluegrass Orthopaedic Group (Dr. Jacob). Dr. Gatewood saw Buckler again on April 11, 2006, in follow-up for right index finger joint swelling and left wrist problems. Dr. Gatewood then saw him in June 2006 for a growth on his chest, which was unrelated to the motor vehicle accident.

Dr. Jacob's office records establish that Buckler's first office visit was on December 7, 2005, when he saw Buckler, on Dr. Gatewood's referral, for probable Ray-naud's disease and left and right wrist and hand sprains. Dr. Jacob concurred with the diagnosis of Raynaud's disease in his left hand, which he did not attribute to the motor vehicle accident. Regarding the right hand, Dr. Jacob repeated the x-ray of the right index finger. The x-ray was within normal limits, and Dr. Jacob advised him to keep that finger under observation. Dr. Jacob believed the long term outlook was favorable and did not expect any long term problems. Regarding the left wrist, Dr. Jacob recommended an MRI to rule out an intercarpal ligamentous tear and suggested that Buckler continue to wear the wrist splint he had been wearing.

Dr. Jacob saw Buckler in follow-up seven months later on June 21, 2006, noting that he had not sought any medical attention or obtained an MRI. At that time, Buckler continued to complain of pain, stiffness, and swelling in his right index finger and occasional pain when he used his left wrist to grip or grasp. Repeated x-rays of the index finger revealed no changes, and left wrist x-rays were also normal. Dr. Jacob advised Buckler to start physical therapy for his finger problems and proceed with an MRI due to the persistence of his problems.

The last set of medical records is from Buckler's regular physician's office, Family Physician Associates. An office note dated October 7, 2002, reflects that Dr. Gardner saw Buckler that day for complaints of an injury to his right index finger that had hyperextended while he was holding a horse halter. Buckler had been to the emergency room the prior Saturday. Dr. Gardner diagnosed a strain to the right index finger, and he recommended that Buckler continue to wear the splint he received at the emergency room.

In addition to the medical records, both Buckler and Mathis introduced evidence of

medical bills Buckler had incurred for various treatments.

At the close of evidence, Mathis moved for a directed verdict on whether Buckler had met the $1,000 threshold pursuant to KRS 304.39–060(2)(b), arguing that Buckler failed to prove that the medical bills he incurred were for treatment he underwent related specifically to the motor vehicle accident. Although it denied Mathis's motion for directed verdict, the trial court included the threshold instruction over Buckler's objection. In addition to objecting to the instruction itself, Buckler also objected to specific language in the instruction that required the jury to find that Buckler himself had incurred the charges for the medical care.

After a short deliberation, the jury returned a verdict in favor of Mathis, having found that Buckler had not met the $1,000 threshold. The trial court entered a judgment dismissing Buckler's claim on November 12, 2009. Buckler then filed a motion for a judgment notwithstanding the verdict or for a new trial. He argued that the trial court improperly instructed the jury by including the threshold question and by using incorrect language in that instruction. Buckler also argued that the trial court improperly commented on the instructions, placing a negative inference on the proof. Finally, Buckler argued that the trial court should not have disallowed Dr. Jacob's testimony regarding permanency. The trial court denied this motion on April 23, 2010, specifically stating that it was within the province of the jury to determine whether the medical expenses were reasonably needed and that its comments related to the instructions were only meant to assist the jury in navigating the instructions. This appeal follows.

In his brief, Buckler continues to argue that the trial court improperly instructed the jury and erred in striking a portion of Dr. Jacob's deposition testimony, entitling him to a new trial. We shall address each issue in turn.

1) Jury Instructions

Buckler raises three issues related to jury instructions in this appeal. Our standard of review for alleged errors in jury instructions is set forth in *Hamilton v. CSX Transp., Inc.*, 208 S.W.3d 272, 275 (Ky.App.2006):

> Alleged errors regarding jury instructions are considered questions of law that we examine under a *de novo* standard of review. *Reece v. Dixie Warehouse and Cartage Co.*, 188 S.W.3d 440, 449 (Ky.App.2006). "Instructions must be based upon the evidence and they must properly and intelligibly state the law." *Howard v. Commonwealth*, 618 S.W.2d 177, 178 (Ky.1981). "The purpose of an instruction is to furnish guidance to the jury in their deliberations and to aid them in arriving at a correct verdict. If the statements of law contained in the instructions are substantially correct, they will not be condemned as prejudicial unless they are calculated to mislead the jury." *Ballback's Adm'r v. Boland–Maloney Lumber Co.*, 306 Ky. 647, 652–53, 208 S.W.2d 940, 943 (1948).

■ First, Buckler contends that the trial court erred by giving a threshold instruction.

In KRS 304.39–060(2) of the Kentucky Motor Vehicle Reparations Act, the legislature set forth the requirement that before a person may recover damages under the act, his medical expenses must exceed $1,000:

> (b) In any action of tort brought against the owner, registrant, operator or occupant of a motor vehicle with respect to which security has been provided as re-

quired in this subtitle, or against any person or organization legally responsible for his or her acts or omissions, a plaintiff may recover damages in tort for pain, suffering, mental anguish and inconvenience because of bodily injury, sickness or disease arising out of the ownership, maintenance, operation or use of such motor vehicle only in the event that the benefits which are payable for such injury as "medical expense" or which would be payable but for any exclusion or deductible authorized by this subtitle exceed one thousand dollars ($1,000)....

In KRS 304.39–020(5)(a), the legislature defined "medical expense" in relevant part as follows:

(a) "Medical expense" means reasonable charges incurred for reasonably needed products, services, and accommodations, including those for medical care, physical rehabilitation, rehabilitative occupational training, licensed ambulance services, and other remedial treatment and care.... There shall be a presumption that any medical bill submitted is reasonable.

The Supreme Court of Kentucky addressed the definition of "medical expense" in *Bolin v. Grider*, 580 S.W.2d 490 (Ky. 1979), stating that KRS 304.39–020(5)(a) reflects a legislative policy that a medical expense must be reasonable in amount and "reasonably needed as a result of the collision in issue." *Bolin*, 580 S.W.2d at 491. Furthermore, once a medical bill has been introduced, the burden is on the defendant to go forward with proof to impeach the bill. *Id.* In *Bolin*, the defendant attacked whether the medical expense was reasonably needed due to the collision, not whether the amount of the charge was reasonable. The Court stated that a proper question on this issue would read:

Are you satisfied from the evidence that Grider incurred charges in excess of $1,000.00 for reasonably needed products, services, and accommodations, including those for medical care and physical rehabilitation, as a result of the collision of July 7, 1975?

*Id. See also Thompson v. Piasta*, 662 S.W.2d 223, 226 (Ky.App.1983) (jury instructions using the phrase "reasonable expenses" were improper when issue posed by the proof in that case was whether the expenses were "reasonably needed.").

In this case, the trial court included the following interrogatory as Question No. 1:

Are you satisfied from the evidence that Plaintiff, Donald Buckler, sustained injuries and charges in excess of $1,000 for reasonably needed products and services for medical care as a direct result of the motor vehicle accident of September 1, 2005?

Buckler contends that because the medical expenses he submitted totaled $2901.90, far in excess of the $1,000 threshold, and Mathis failed to call any witnesses to question the relationship between the bills and the collision, the trial court should not have included this interrogatory in the instructions.

Mathis, in turn, contends that Buckler was unable to establish a causal connection between all of the submitted medical bills and the motor vehicle accident. And while she did not call separate witnesses on this issue, Mathis states that she was able to establish this lack through the testimony of both Buckler and Dr. Jacob. Mathis points out that the medical records showed that Buckler had a prior injury to his right index finger, one that he did not report to his treating physicians, and that he was referred to Dr. Jacob for treatment related to Raynaud's disease in his left hand, which was unrelated to the motor vehicle accident. We agree with Mathis that,

based upon Buckler's testimony as well as the medical records and proof related to prior or unrelated injuries or conditions, the trial court did not commit any error in including the threshold question in the jury instructions regarding whether the medical expenses were reasonably needed as a result of the motor vehicle accident.

Second, Buckler contends that the trial court erred in the language it used in the threshold question interrogatory and in the damages instruction. In Instruction No. 3, the trial court stated that Buckler's damages may include: "(A) Reasonable expenses for medical services you believe from the evidence Plaintiff has incurred as a direct result of his injuries, not to exceed $2901.90, the amount claimed." Buckler contends that the instructions improperly required the jury to find that he, himself, incurred the charges for medical expenses, not another entity such as an automobile insurance or workers' compensation carrier. He argues that the trial court should have more closely parroted the statutory definition of medical expenses ("reasonable charges incurred . . ."), rather than instructing that the jury had to find that he "incurred charges" or in defining an item of damages as "[r]easonable expenses for medical services . . . Plaintiff has incurred[.]"

█ Buckler implicitly concedes that language in the instructions stated by the appellate courts in *Bolin v. Grider, supra,* and *Thompson v. Piasta, supra,* is identical to the language used in this case. However, Buckler contends that the courts in those cases misapplied the statute in setting forth the proper method of instructing the jury on this issue. While we do not agree with Buckler's argument in this regard, we, as an intermediate appellate court, cannot overturn precedent as set forth by the Supreme Court of Kentucky, which is what Buckler is requesting

us to do. "The Court of Appeals is bound by and shall follow applicable precedents established in the opinions of the Supreme Court and its predecessor court." Rules of the Supreme Court (SCR) 1.030(8)(a). *See also Fields v. Lexington–Fayette Urban County Gov't,* 91 S.W.3d 110, 112 (Ky. App.2001) (stating that the Court of Appeals is without the authority to overturn a decision of the Supreme Court of Kentucky even if it were inclined to do so.).

Because the instructions provided by the trial court are in line with binding precedent as set forth in *Bolin v. Grider, supra,* we uphold those instructions as proper.

█ Third, Buckler contends that the trial court improperly commented on the instructions as they were read to the jury. In doing so, he states that the trial court placed a negative inference by way of voice inflection on what the jury should ultimately find. In support of this argument, Buckler cites to *Young v. J.B. Hunt Transp., Inc.,* 781 S.W.2d 503 (Ky.1989), in which the Supreme Court addressed Kentucky's approach to instructing juries:

> [I]n Kentucky we observe a "bare bones" approach to jury instructions. To provide the detail which would otherwise be missing, we have held that "[t]his skeleton may then be fleshed out by counsel on closing argument." *Rogers v. Kasdan,* Ky., 612 S.W.2d 133, 136 (1981). *See also Cox v. Cooper,* Ky., 510 S.W.2d 530 (1974), and *Wemyss v. Coleman,* Ky., 729 S.W.2d 174 (1987). Descriptive of the approach we take to instructions and argument is a passage from *Collins v. Galbraith,* Ky., 494 S.W.2d 527 (1973), as follows:

> > In conclusion, it may be well to mention that whenever counsel feels that jurors might draw inferences that are not warranted by the specific terminology of the instructions, his opportunity to guard against it comes in the

closing argument. If instructions are to be kept concise and to the point, as they should be, their supplementation, elaboration and detailed explanation fall within the realm of advocacy. Contrary to the practice in some jurisdictions, where the trial judge comments at length to the jury on the law of the case, the traditional objective of our form of instructions is to confine the judge's function to the bare essentials and let counsel see to it that the jury clearly understands what the instructions mean and what they do not mean.

*Id.* at 531. From the foregoing, it is clear that in the absence of a compelling reason to do otherwise, counsel is entitled to considerable latitude during argument.

*Young,* 781 S.W.2d at 506–07.

We have carefully reviewed both the unofficial transcription of the trial court's comments as set forth in Buckler's brief in conjunction with the videotaped record of the trial. We also have considered the trial court's statements in its April 23, 2010, order explaining that its comments "were meant to instruct the jury as to how to 'get through' the jury instructions" in order to prevent problems in past trials where juries had returned incomplete or inconsistent verdicts. In this case, the trial court took great pains to explain to the jury what it was to do once it answered Question No. 1, the threshold interrogatory, and that the jury was not to continue to the damages instruction if it had found that Buckler failed to meet the $1,000 threshold. Based on our review of this issue, we agree with Mathis that the trial court did not do or say anything to influence the jury to find one way or the other. The trial court did not provide any legal explanation of the instructions, but merely attempted to educate the jury as to what it

should do in relation to completing the instructions and verdict forms depending on what findings it made.

Accordingly, we hold that the trial court did not commit any error in instructing the jury in this matter.

2) Deposition testimony of Dr. Jacob

■ Next, Buckler argues that the trial court improperly struck a portion of Dr. Jacob's deposition testimony because Mathis's written objection was untimely and because she failed to object during the deposition. We shall review the trial court's ruling on this issue for abuse of discretion. *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 577 (Ky. 2000).

The passage at issue in Dr. Jacob's deposition addresses the permanency of Buckler's injuries, and it reads as follows:

Q: Dr. Jacob, I'm going to ask you a rather lengthy question here that's going to have several parts, and I apologize. If I confuse you, or you don't understand the circumstances I'm describing, please let me know. Okay?

Mr. Buckler's deposition was taken on April 3rd of 2008. And again, the x-rays were negative with regard to any fracture or with regard to the development of degenerative arthritis when they were redone, I think, in June of '06. And basically, that means the x-rays didn't show any fractures. If he had been wearing a wrist splint, as had been prescribed to him, if he had gone through physical therapy and done recommended exercises at home, and still after more than three years he still has pain in his right hand and wrist, and limitation of the range of motion in his hand, do you have an opinion as to whether these injuries are permanent?

A: All of that—assuming the accuracy of all of that verified by physical examination, yes.

Q: Okay.

A: But that's based on—I would have to base it on his physical exam.

Buckler bases his timeliness argument on the trial court's pretrial deadlines requiring that any objections to deposition testimony must be filed ten days prior to trial. Because the court did not extend the deadline on those objections when it continued the trial, Mathis's objections were due ten days prior to the June 2, 2009, trial date. Mathis filed her objection to Dr. Jacob's deposition testimony on May 26, 2009. During the hearing on the matter, counsel for Mathis pointed out, and we agree, that the written objection was timely filed by operation of Kentucky Rules of Civil Procedure (CR) 6.01. That rule provides that in the event the last day of the period is a Saturday, Sunday, or legal holiday, "the period runs until the end of the next day which is not a Saturday, a Sunday, or a legal holiday." Based on the 2009 calendar, ten days prior to trial was May 23, a Saturday, and Monday, May 25, was Memorial Day, a legal holiday. Therefore, Mathis timely filed her objection on Tuesday, May 26, 2009.

■ Buckler next argues that Mathis failed to object during the deposition to the above line of questioning. CR 32.04(3) addresses objections as to the taking of depositions and provides in part as follows:

(a) Objections to the competency of a witness or to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which might have been obviated or removed if presented at that time.

(b) Errors and irregularities occurring at the oral examination in the manner of taking the deposition, in the form of the questions or answers, in the oath or affirmation, or in the conduct of parties and errors of any kind which might be obviated, removed, or cured if promptly presented, are waived unless seasonable objection thereto is made at the taking of the deposition.

Buckler also cites to *T.C. Young Constr. Co. v. Brown,* 372 S.W.2d 670 (Ky.1963), for the proposition that objections made at trial to deposition testimony for failure to establish the integrity of x-rays were too late: "Certainly this particular objection was too late when first made during the reading of the deposition at the trial." *Id.* at 674. We note that Mathis made her objection to the deposition testimony prior to trial. Based on these authorities, Buckler contends that Mathis waived her opportunity to object because the problem posed by the question could have been cured had it been presented promptly. We disagree.

The parties extensively argued this issue at a court hearing on September 4, 2009, several months after Mathis filed her written objection. The trial court based its ruling striking the testimony regarding Dr. Jacob's qualification of his opinion on permanency to the performance of a current physical examination. In fact, because of its delay in ruling, the trial court opted to continue the trial to specifically permit Buckler to take additional testimony from Dr. Jacob regarding permanency. That Buckler was unable to schedule a physical examination and re-depose Dr. Jacob prior to the new trial date is of no course, especially as Buckler had known of the basis of Mathis's objection for several months prior to the entry of the ruling. Therefore, the trial court's ruling striking portions of Dr. Jacob's testimony regarding the permanency of Buckler's injuries was not an abuse of discretion.

Accordingly, the judgment and the order denying Buckler's motion for a new trial are affirmed.

ALL CONCUR.