MONUMENTAL LIFE INSURANCE COMPANY, Successor in Interest to Commonwealth Life Insurance Company, Appellant,

v.

The DEPARTMENT OF REVENUE, formerly known as the Revenue Cabinet, Finance and Administration Cabinet, Commonwealth of Kentucky; Louisville/Jefferson County Metro Government, formerly known as City of Louisville, Kentucky and Jefferson County, Kentucky; and Kentucky Board of Tax, Appellees.

No. 2005–CA–002148–MR.

Court of Appeals of Kentucky.

June 27, 2008.

Rehearing Denied Sept. 8, 2008.

Discretionary Review Denied by Supreme Court Oct. 21, 2009.

Mark F. Sommer, Mark A. Lloyd, Louisville, KY, William A. Chittenden III, Chicago, IL, for appellant.

Stephen G. Dickerson, Laura M. Ferguson, Frankfort, KY, for appellee, the Department of Revenue.

Gary E. Siemens, Robert P. Benson, Jr., John M. Shardein, Asst. Jefferson County Attorney, Louisville, KY, for appellee, Louisville/Jefferson County Metro Government.

Before THOMPSON, Judge; BUCKINGHAM and HENRY, Senior Judges.[1]

*OPINION*

HENRY, Senior Judge.

Monumental Life Insurance Company (Monumental) appeals from an opinion and

1. Senior Judges David C. Buckingham and Michael L. Henry sitting as Special Judges by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

order of the Franklin Circuit Court affirming an order of the Kentucky Board of Tax Appeals (Board) that denied Monumental's tax refund claims for the tax years 1990 through 1996. Monumental also appeals from the Board's denial of its request for relief from additional tax assessments issued by the Revenue Cabinet (Cabinet), the City of Louisville, and Jefferson County for the tax years 1995 through 1998.[2] The primary issues raised are (1) whether the Cabinet erroneously treated the value of investment corporate stock held by Monumental when computing its tax liability pursuant to Kentucky Revised Statutes (KRS) 136.320 for the years 1990 through 1996 (referred to by the parties as the "capital stock tax"), and (2) whether the Cabinet properly subjected assets booked as "separate accounts" to taxation during the years 1995 through 1998.

Monumental is a domestic life insurance company which conducts business within the Commonwealth of Kentucky and is, therefore, subject to KRS 136.320, which requires that it pay a property tax on its "taxable capital" and "taxable reserves."[3] Taxable capital is taxed at a rate of 0.7%, while taxable reserves are taxed at the significantly lower rate of 0.001%. KRS 136.320(3). Taxable capital includes the fair cash value of the company's intangible property, including shares of stock, less taxable reserves and exempt intangible property. KRS 136.320(2)(a). Taxable reserves consists of reserves on all outstanding insurance policies and contracts multiplied "... by the percentage determined by dividing capital, less exempt intangible

personal property, by capital including exempt intangible personal property." KRS 136.320(2)(b). During the period at issue Monumental also paid local option ad valorem taxes levied by the City of Louisville and Jefferson County that were determined on the basis of its taxable capital as certified by the Cabinet.

In anticipation of the resolution of *St. Ledger v. Revenue Cabinet*, 912 S.W.2d 34 (Ky.1995), *vacated by remand, St Ledger v. Kentucky Revenue Cabinet*, 517 U.S. 1206, 116 S.Ct. 1821, 134 L.Ed.2d 927 (1996), *on remand, St. Ledger v. Revenue Cabinet*, 942 S.W.2d 893 (Ky.1997), *cert. dismissed, St. Ledger v. Kentucky Revenue Cabinet*, 521 U.S. 1146, 118 S.Ct. 27, 138 L.Ed.2d 1057 (1997), Monumental began filing annual protective refund claims with the Cabinet, the City of Louisville and Jefferson County. *St. Ledger*[4] dealt with the constitutionality of KRS 136.020 (which, among other things, imposed a corporate ad valorem tax on various property, including stock) and KRS 136.030(1) (which exempted from ad valorem taxes the stock held by individual shareholders of corporations which paid Kentucky taxes on at least 75% of its total property).[5] As further discussed below, the *St. Ledger* decision expressly held KRS 136.020 and KRS 136.030(1) to be unconstitutional.

Following the finality of *St. Ledger*, Monumental adopted the position that all stock assets should be excluded from the ad valorem tax calculations imposed under KRS 136.320. It accordingly filed its 1997

2. For convenience, we include appellees the City of Louisville and Jefferson County in our references to the Cabinet. These governmental units support the Cabinet's determinations.

3. All references to KRS 136.320 are to the statute as it existed prior to 1998, when the tax was changed to include a premium tax.

4. Unless the context indicates otherwise, references to *St. Ledger* refer to the 1997 Kentucky Supreme Court decision in the cause.

5. This statute is sometimes referred to in the record as the "exemption statute."

and 1998 tax returns reflecting this position. The Cabinet initially accepted the Monumental method, though the Cabinet states that this was a result of auditor error.

Following the Kentucky Supreme Court's decision in *St. Ledger*, the Cabinet began processing the many refund claims owed taxpayers as a result of the decision, including Monumental's protective refund claims filed between 1991 and 1996. In calculating the tax due, rather than excluding stock altogether pursuant to Monumental's proposed method, the Cabinet treated Monumental's stock assets as exempt intangible personal property in the KRS 136.320 calculations resulting in a total refund due of $1,470,357.49. Monumental protested the Cabinet's refund amount on the basis that *St. Ledger* required that stock holdings be altogether excluded from the formula. Using this method, Monumental calculated a total refund due of $8,107,668.00 plus additional interest.

During the protest process, the Cabinet again audited Monumental's 1998 return. As a result of the audit the Cabinet determined that Monumental had failed to include in its ad valorem report holdings booked to an account titled "separate accounts," which consists primarily of pension and retirement assets held in Monumental's name for future payout to retirees. The Cabinet thereafter recomputed Monumental's 1998 tax liability to include these assets, with the result that Monumental's liability increased from $48,672 to $3,061,280. The Cabinet also recomputed Monumental's tax liability for the years 1995 through 1998 to take into account separate account assets, and assessed an additional $2,895,878.42 for those years.[6]

The matter was brought before the Board which, after an evidentiary hearing, upheld the Cabinet's ruling. The Franklin Circuit Court affirmed the Board's ruling. This appeal followed.

### STANDARD OF REVIEW

KRS 131.370 sets out the appeals procedure from an order of the Board, and provides that such appeals are to be "in accordance with KRS Chapter 13B." According to KRS 13B.150(2), we may not substitute our judgment for that of the agency as to the weight of the evidence on questions of fact. KRS 13B.150(2) further provides that we may reverse the KBTA's final order, in whole or in part, only if we find that the order is:

(a) In violation of constitutional or statutory provisions;

(b) In excess of the statutory authority of the agency;

(c) Without support of substantial evidence on the whole record;

(d) Arbitrary, capricious, or characterized by abuse of discretion;

(e) Based on an ex parte communication which substantially prejudiced the rights of any party and likely affected the outcome of the hearing;

(f) Prejudiced by a failure of the person conducting a proceeding to be disqualified pursuant to KRS 13B.040(2); or

(g) Deficient as otherwise provided by law.

■■■ Consistent with the general standard applicable to appeals from administrative agencies, courts are limited to reviewing findings of fact based on the substantial evidence rule. Where the administrative agency's findings of fact are supported by substantial evidence, those

---

**6.** These assets had similarly not been taxed in years prior to 1995; however, pursuant to the applicable statute of limitations, 1995 was as far back as the Cabinet could go.

findings are binding on the reviewing court; this is true even though there may be conflicting evidence in the record. *Urella v. Kentucky Bd. of Medical Licensure*, 939 S.W.2d 869 (Ky.1997); *H & S Hardware v. Cecil and Kentucky Unemployment Insurance Commission*, 655 S.W.2d 38, 40 (Ky.App.1983). Substantial evidence is evidence taken by itself or as a whole that "has sufficient probative value to induce conviction in the minds of reasonable men." *Commonwealth of Kentucky, Cabinet for Human Resources v. Bridewell*, 62 S.W.3d 370, 373 (Ky.2001). Issues of law, however, as always, are reviewed de novo. *Gosney v. Glenn*, 163 S.W.3d 894, 898 (Ky.App.2005); *Reis v. Campbell County Bd. of Educ.*, 938 S.W.2d 880 (Ky.1996) (Legal errors of administrative body may always be corrected by reviewing court).

### *ST. LEDGER'S EFFECT UPON TAXABILITY OF STOCK*

■ Monumental alleges that as a result of the Kentucky Supreme Court's decision in *St. Ledger*, its stock holdings are not subject to ad valorem taxes, and must be excluded from any part of the tax computation under KRS 136.320. Monumental asserts that *St. Ledger* did not merely alter how the capital stock tax was to be calculated, but instead mandated that all stock be excluded from the tax calculation. Under its interpretation, the Kentucky Supreme Court's opinion was sufficiently broad so as to sever from KRS 136.320 as unconstitutional the statute's reference in Section (1)(a) to "shares of stock." Thus, Monumental contends that all stock must be excluded from the calculations under KRS 136.320. Under Monumental's calculation, stock is factored completely out of the tax calculation (this method is referred to in the record as the "exclusion method"), whereas the Cabinet uses stock holdings in its calculations to first include stock in the calculation of capital under Section (1)(a), and then to deduct the value of the stock as "exempt intangible personal property" in the calculations in Sections (2)(a) and (2)(b) (this method is referred to in the record as the "exemption method"). Pursuant to the resulting mathematics, the exclusion method results in a lower tax liability than the exemption method.

Because this argument involves the interpretation of *St. Ledger* and KRS 136.020—issues of law—our standard of review is de novo. *Gosney v. Glenn, supra.*

The issues in *St. Ledger* concerned the corporate shares tax contained in KRS 132.020(1), which imposed an ad valorem tax on stock shares, and the exemption statute contained in KRS 136.030(1).[7] KRS 132.020(1) levied an ad valorem tax of twenty-five cents upon each one hundred dollars of value of, among other things, shares of stock. Pursuant to the exemption statute, KRS 136.030(1), individual shareholders were "not required to list their shares for ad valorem taxation so long as the corporation pays taxes to the state of Kentucky on at least 75% of its total property." Based on the United States Supreme Court decision in *Fulton Corp. v. Faulkner*, 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996), the *St. Ledger* Court first held that the exemption statute violated the Commerce Clause as discriminatory against out-of-state corporations, and, was, therefore, unconstitutional. United States Constitution, Art. 1 § 8, c. 3.

Having held the exemption statute, KRS 136.030(1), unconstitutional, the Court then

---

**7.** Also addressed in *St. Ledger* was the constitutionality of KRS 132.030, the bank deposits tax, which treated taxation of in-state and out-of state bank deposits differently. The Court's ruling in that regard is not relevant to our present discussion.

considered whether the corporate shares ad valorem tax under KRS 132.020(1) could remain in effect. Relying on the expressed policy of the Commonwealth that double taxation is prohibited, it concluded that shares of stock could not be taxed pursuant to KRS 132.020(1), and likewise struck it as unconstitutional in recognition that the legislature had originally enacted the exemption statute, KRS 136.030(1), to avoid double taxation of Kentucky's corporate shareholders. Since striking only the exemption statute and leaving KRS 132.020(1) intact "would result in the taxation of not only corporations but also their shareholders," KRS 132.020 was likewise declared invalid insofar as it taxed shares of stock. The decision in *St. Ledger* explained the Court's reasoning as follows:

> [T]his Court has ruled that double taxation is against public policy and will be permitted only when the Legislature has clearly declared a contrary policy. *Kentucky Power Co. v. Revenue Cabinet, Ky.*, 705 S.W.2d 904 (1985). As we determined in *George v. Scent, Ky.*, 346 S.W.2d 784 (1961), statutes are to be construed in a manner which avoids double taxation in any form, even if the double taxation is the result of imposition of a tax by another governmental authority. Thus, by enacting the Exemption Statute, the Legislature clearly indicated that the double taxation of Kentucky's corporate shareholders should be avoided. Accordingly, we must consider the Corporate Shares Tax and the Exemption Statute inseparable,

because the striking of the Exemption Statute would result in the taxation of not only corporations, but also their shareholders, a result in direct contravention of the expressed intent of the General Assembly.

*Id.* at 897.

In summary, *St. Ledger* struck down KRS 136.030(1) as unconstitutional pursuant to the federal commerce clause, and KRS 132.020 to avoid double taxation. Despite this relatively straight-forward holding, in support of its argument Monumental claims that *St. Ledger* held "that stock assets could not be subject to valuation-based ad valorem taxation." However, not only does *St. Ledger* make no such statement, but the Court in that decision declined to disturb any of its previous holdings specifically approving the ad valorem taxation of corporate shares. Moreover, KRS 136.320 is not mentioned at all in the *St. Ledger* opinion.

With the foregoing said, we believe the argument in this case is not about whether or not stock holdings are to be taxed in Kentucky as a result of *St. Ledger*. We believe that under the Cabinet's method they are not.[8] However, Monumental appears to believe that *St. Ledger* changed the character of shares of corporate stock into something akin to radioactive material for purposes of taxation: not only can the shares themselves not be taxed, they cannot even be briefly exposed to other taxable assets of the same character in order to calculate a tax. We believe this is this

8. We note that following the *St. Ledger* decision the General Assembly repealed KRS 136.030 and removed the reference to stock from KRS 132.020. Monumental's refund claims apply to times when the prior versions of those statutes were still in effect. Even though KRS 136.320 has neither been repealed nor amended to delete its reference to shares of stock as a component of "capital,"

after *St. Ledger* the Cabinet exempted their value from the tax imposed by that statute. However, we believe that *St. Ledger* did not specifically require such an exemption. While a number of possible reasons for this concession by the Cabinet come to mind (*see, e.g., St. Ledger* at 903, Graves, J., dissenting in part) no specific reason has been offered by the Cabinet.

an excessively extravagant extension of *St. Ledger*. We find nothing in the *St. Ledger* opinion which purported to affect KRS 136.020's use of stock in its formulas. As such, the principal underpinning of Monumental's argument is, we believe, based upon a misinterpretation of *St. Ledger*.

While we believe Monumental's misinterpretation of *St. Ledger* substantially defeats its arguments challenging the Cabinet's computation method, we next address whether the Cabinet properly applied KRS 136.020 in calculating the tax liability for the years 1991 through 1996. The version of KRS 136.020 in effect during the time period we are concerned with stated as follows:

1) Each life insurance company incorporated under the laws of and doing business in Kentucky shall value as of January 1 and report to the Revenue Cabinet by July 15, 1966, and by April 1 each year thereafter, on forms prescribed by the Revenue Cabinet, the following:

(a) The fair cash value of the company's intangible personal property, hereinafter referred to as "capital," consisting of all money in hand, **shares of stock**, notes, bonds, accounts, and other credits, exclusive of due and deferred premiums, whether secured by mortgage, pledge, or otherwise, or unsecured. [Emphasis added].

(b) The fair cash value of the company's intangible personal property exempt from taxation by law.

(c) The aggregate amount of company's reserves, reduced by the amount of due and deferred premiums, maintained in accordance with the applicable provisions of KRS 304.6–040 and 304.6–130 to 304.6–180, on all outstanding policies and contracts supplementary thereto.

(d) Such other information as may be required by the Revenue Cabinet to accurately determine the fair cash value of each company's "taxable capital" and "taxable reserves."

(2) Based on information supplied by each company and such other information as may be available, the Revenue Cabinet shall value each company's "taxable capital" and "taxable reserves" as follows:

(a) "Taxable capital" shall be determined by deducting "taxable reserves" from "capital," less exempt intangible personal property.

(b) "Taxable reserves" shall be determined by multiplying the aggregate amount of reserves as computed in subsection (1)(c) of this section by the percentage determined by dividing "capital," less exempt intangible personal property, by "capital," including exempt intangible personal property.

(3) An annual tax of seventy cents ($0.70) on each one hundred dollars ($100) of the fair cash value of "taxable capital" and one-tenth of one cent ($0.001) on each one hundred dollars ($100) of the fair cash value of "taxable reserves" shall be imposed for state purposes. The tax shall be in lieu of all excise, license, occupational, or other taxes imposed by the state, county, city, or other taxing district, except as provided in subsections (4), (5), and (6) of this section.

(4) The county in which the principal office of the company is located may impose a tax of fifteen cents ($0.15) on each one hundred dollars ($100) of "taxable capital."

(5) The city in which the principal office of the company is located may impose a tax of fifteen cents ($0.15) on each one hundred dollars ($100) of "taxable capital."

(6) The Revenue Cabinet shall by September 1 each year bill each company

for the state taxes. It shall immediately certify to the county clerk of the county in which the principal office of the company is located the value of "taxable capital" subject to local taxation. The county clerk shall prepare and deliver a bill to the sheriff for collection of taxes collectible by the sheriff and shall certify the value to all other collecting officers of districts authorized to levy a tax.

(7) Each company's real and tangible personal property shall be subject to taxation at fair cash value by the state, county, school, and other taxing districts in which such property is located in the same manner and at the same rates as all other property of the same class.

(8) Taxes on property subject to taxation under this section shall be subject to the same discount and penalties as provided in KRS 134.020 and shall be collected in the same manner as taxes on property locally assessed, except that the state tax on the "taxable capital" and "taxable reserves" shall be collected directly by the Revenue Cabinet.

(9) Any taxpayer subject to taxation under this section may protest in the manner provided in KRS 131.110.

 The interpretation of a statute is a matter of law. *Commonwealth v. Garnett*, 8 S.W.3d 573, 575–6 (Ky.App. 1999). The primary purpose of judicial construction is to carry out the intent of the legislature. In construing a statute, the courts must consider "the intended purpose of the statute-and the mischief intended to be remedied." "A court may not interpret a statute at variance with its stated language." *SmithKline Beecham Corp. v. Revenue Cabinet*, 40 S.W.3d 883, 885 (Ky.App.2001). The first principle of statutory construction is to use the plain meaning of the words used in the statute. *See Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815 (Ky.2005); KRS 446.080(4).

"[S]tatutes must be given a literal interpretation unless they are ambiguous and if the words are not ambiguous, no statutory construction is required." *Commonwealth v. Plowman*, 86 S.W.3d 47, 49 (Ky.2002). We lend words of a statute their normal, ordinary, everyday meaning. *Id.* "We are not at liberty to add or subtract from the legislative enactment or discover meanings not reasonably ascertainable from the language used." *Commonwealth v. Harrelson*, 14 S.W.3d 541, 546 (Ky.2000). The courts should reject a construction that is "unreasonable and absurd, in preference for one that is 'reasonable, rational, sensible and intelligent [.]'" *Commonwealth v. Kerr*, 136 S.W.3d 783, 785 (Ky.App.2004); *Commonwealth v. Kash*, 967 S.W.2d 37, 43–44 (Ky.App.1997).

First, we note that KRS 136.020 expressly provides for the inclusion of "shares of stock" in the initial calculation of "capital." In this respect, it is treated the same as, for example, money, notes, and bonds. Thus the plain language of the statute supports the Cabinet's method and is adverse to Monumental's method.

Second, we believe the complete exclusion of stock from the calculations described in KRS 136.320, as proposed by Monumental, yields an illogical and absurd result. As previously discussed, at the times in issue the intangible assets of domestic life insurance companies were taxed at two different rates. "Taxable capital" was taxed at the rate of $0.70 per $100 (or to use terms more illustrative of the sums in issue here, $700,000 per $100 million) and its "taxable reserves" were taxed at the rate of $0.001 per $100 (or $1,000 per $100 million). While we need not get into the specific math, it is important to note that the method proposed by Monumental (the exclusion method) allocates more value to taxable reserves, whereas the Cabinet's method (the exemption method) allo-

cates more to taxable capital. Thus it is not difficult to see why Monumental, or, indeed, any rational taxpayer would want to increase taxable reserves and decrease taxable capital. Because of the differential in tax rates, such allocation results in a lower tax liability.

Monumental's method, however, results in what we believe to be a manifestly illogical result. For example, under the method proposed by Monumental, its 1995 tax return would report total capital equal to *negative* $145 million. Such a result cannot be reconciled with the sort of logic one normally expects to find in tax statutes.

Moreover, if the situation is considered whereby two hypothetical domestic life insurance companies with the same dollar amount of "taxable capital," one with substantial stock holdings and the other with little or no stock in its investment portfolio, the former would pay much less tax. Such disparate treatment would violate Section 171 of the Kentucky Constitution, which requires uniform taxation of all property within the same class. This difficulty is avoided entirely if stock is exempted rather than excluded in calculating the tax.

In addition, we believe the method used by the Cabinet follows the calculation procedures as set forth in KRS 136.020, and, to the extent the statute could be construed as ambiguous, the Cabinet's view is a reasonable interpretation of the statute it is charged with enforcing.

 Alternatively, however, Monumental argues that the doctrine of contemporaneous construction requires the application of the exclusion method in the tax calculations under KRS 136.020. Monumental offers two reasons for this: first, because the Cabinet initially "accepted" this method in its audits of Monumental's 1997 and 1998 returns, and (2) because the Cabinet has used this method in relation to partnership interests and mutual funds.

The doctrine of contemporaneous construction means that where an administrative agency has the responsibility of interpreting a statute that is in some manner ambiguous, the agency is restricted to any long-standing construction of the provisions of the statute it has made previously. Practical construction of an ambiguous law by administrative officers continued without interruption for a very long period is entitled to controlling weight.

*GTE v. Revenue Cabinet, Com. of Ky.*, 889 S.W.2d 788, 792 (Ky.1994) (citation and internal quotation omitted).

The doctrine of contemporaneous construction has no application under the facts of this case. We cannot accept either that the Cabinet's acceptance of Monumental's method in its initial audits for a two-year period—which the Cabinet contends resulted from auditor error—amounted to a "construction" of the law, or that the two-year time frame during which the Cabinet "accepted" the method satisfies the requirement of a "long-standing" period of time within the meaning of the doctrine. *See Revenue Cabinet v. Lazarus, Inc.*, 49 S.W.3d 172 (Ky.2001). Moreover, stock is distinguishable from partnership interests and mutual funds because stock is specifically listed in KRS 136.020 whereas partnership interests and mutual funds are not.

 Under this argument heading Monumental also argues that the Board erred by excluding evidence concerning the Cabinet's policies to avoid double taxation in relation to partnership interests and mutual funds. Monumental sought to present the evidence in connection with its argument for the application of the contemporaneous construction doctrine.

However, as noted above, KRS 136.020 is not concerned with partnership interests and mutual funds, and evidence relating to those assets was accordingly not relevant to the issues at bar. Thus we do not believe the Board abused its discretion by disallowing the evidence.

## WHETHER MONUMENTAL'S SEPARATE ACCOUNT ASSETS ARE SUBJECT TO TAX

Monumental argues that the Cabinet erred by assessing a tax liability against its "separate accounts" assets for the years 1995 through 1998. The separate account assets consist principally of retirement fund amounts held for distribution to retirees in the future.

Monumental and like companies are permitted to create separate accounts pursuant to KRS 304.15–390. The pertinent provisions of that statute provide:

(1) A domestic life insurer may establish one (1) or more separate accounts, and may allocate thereto, in accordance with the terms of a written contract or agreement, any amounts paid to the insurer in connection with a pension, retirement or profit-sharing plan, life insurance, or an annuity which are to be applied to provide benefits payable in fixed or in variable dollar amounts or in both.

. . . .

(3) Assets allocated to a separate account shall be valued at their market value on the date of valuation, or if there is no readily available market, then in accordance with the terms of the applicable contract or agreement; except, that the portion of the assets of such separate account at least equal to the insurer's reserve liability with regard to the guaranteed benefits and funds referred to in subsection (1) of this section, if any, shall be valued in accordance with

rules otherwise applicable to the insurer's assets.

. . . .

(6) Amounts allocated by domestic life insurers to separate accounts in the exercise of the power granted by this section shall be owned by the insurer and the insurer shall not be, or hold itself to be, a trustee, in respect to such amount.

KRS 136.020(1)(a) defines "capital" as "consisting of **all** money in hand, shares of stock, notes, bonds, accounts, and other credits, exclusive of due and deferred premiums, whether secured by mortgage, pledge, or otherwise, or unsecured." (Emphasis added). Upon the application of the plain language of the statute, the holdings booked into the "separate accounts" account clearly fall within the statutory definition. Monumental does not seriously dispute this but, rather, relies upon a variety of theories to shield the account from taxation.

First, Monumental contends that the account is shielded from taxation based upon the doctrine of contemporaneous construction. Monumental underpins this argument by alleging that for over 20 years it has not reported this account for taxation purposes, the Cabinet audited those returns and accepted the exclusion of the account, and, therefore, the Cabinet has a long-standing construction of excluding the account from taxation. The Cabinet alleges, however, that it was never its policy to exclude holdings booked to the account but, rather, the substance of the account only came to light during the 1998 audit when Monumental finally provided an itemized listing of the assets booked to the account. The Cabinet faults Monumental for deficient reporting over the 20 or so past years and states that when it realized that the assets booked to the account were taxable, it immediately assessed current and back taxes. Contem-

poraneous construction cannot be asserted by a taxpayer to, in effect, create for itself an amnesty for a long period of failing to self-report taxable assets. "Mere nonaction upon the part of the officers of the state is not to be treated as contemporaneous construction. Nor can the Cabinet change the law through mistake." *Lazarus, Inc.,* at 175 (internal citation and quotation marks omitted).

█ Alternatively, Monumental contends that the account is not subject to taxation because it has no cash value. It alleges that it merely holds legal title to the assets booked to the account, but that the retirement/pension beneficiaries hold equitable title to the assets and that, therefore, the account assets are specifically tied to a guaranteed benefit or payment in connection with pension retirement plans. It follows, Monumental alleges, that the assets have no value to tax.

As noted above, KRS 304.15–390(6) provides that "[a]mounts allocated by domestic life insurers to separate accounts in the exercise of the power granted by this section shall be owned by the insurer and the insurer shall not be, or hold itself to be, a trustee, in respect to such amount." We believe that Monumental's position is inconsistent with the plain language of the statute.

We further note that KRS 136.020 provides no exception for retirement and pension assets. If the legislature sought to exclude such items, it could have easily said so.

█ While Monumental may raise a valid point in distinguishing pension and retirement funds from other types of accounts, it is not our function to set tax policy which is, in effect, what Monumental asks us to do. "To do such would be a complete violation of the separation of powers doctrine set forth in Kentucky's Constitution." *St. Ledger v. Com., Revenue Cabinet,* 942 S.W.2d 893, 898 (Ky. 1997). For this Court to deem the retirement and benefit funds held by Monumental in its "separate accounts" account to be excluded from tax "would, in effect, be this Court delving into a realm our Constitution left squarely within the power of the Legislative Branch." *Id.* As such, we will not disturb the Cabinet's treatment of the account.

█ As its third rationale for nontaxability of the account Monumental alleges that ERISA [9] Section 514(a) bars the imposition of an ad valorem tax on the account. Monumental does not cite us to its preservation of this issue as required by CR 76.12(4)(c). In its December 4, 2003, Order, the Board stated "[Monumental] failed to raise the issue of ERISA in its Petition of Appeal, or in any other pleading except its brief, including the pre-hearing compliance statement and the supplemental pre-hearing compliance statement. Therefore it failed to preserve this issue for review by this Board. The board will not consider the ERISA issue. *Stoner Creek Stud v. Revenue Cabinet,* Ky.App. 746 S.W.2d 73 (1987)." As we have otherwise not been cited to Monumental's proper preservation of the issue, we will likewise not address this argument on the merits. *Shelton v. Commonwealth,* 992 S.W.2d 849, 852 (Ky.App.1998).

█ As its final rationale for nontaxability of the account Monumental alleges that the back assessments were improper under the retroactivity provisions of KRS 132.290. More specifically, Monumental contends that KRS 132.290 permits only *omitted* property to be assessed retroactively, but that it reported the grand total

---

9. Employee Retirement Income Security Act of 1974. 29 U.S.C. § 1001 et seq.

of the account in its reporting forms, and therefore no retroactive assessments are permitted under the statute. KRS 132.290 provides, in relevant part, as follows:

(1).... Any personal property which has not been listed for taxation, for any year in which it is taxable, by the due date of that year shall be deemed omitted property.

(2) All omitted property shall be assessed retroactively in the manner provided by law at any time within five (5) years from the date when it became omitted....

The Board made the following findings relevant to this issue:

A life insurance company such as Monumental is required to file an "Annual Statement" (sometimes referred to as a "Blue Book") with the Commonwealth of Kentucky Department of Insurance reporting its general account assets and liabilities, and, if applicable, an "Annual Statement of the Separate Accounts" (sometimes referred to as a "Green Book").

Monumental reported the separate accounts as a single line item on their Blue books, but failed to list them on line 1 of their capital stock tax returns as capital, as required by KRS 136.320.

The separate accounts, and accompanying detail, are listed in the Green Books, which are financial statements separate and apart from the Blue Book.

....

The Green Books, which detailed the separate accounts, were normally not provided to Revenue when the tax return and Blue Books were filed.[10]

In summary, the foregoing findings reflect that Monumental reported the grand total of the separate accounts account in its filings with the Cabinet, but failed to file the supporting subaccounts which would disclose to the Cabinet that items booked to the account were taxable. Most significantly, taxable items were not listed for KRS 136.320 taxation purposes. Thus, we believe the separate accounts account for the periods in question qualify as "omitted" under KRS 132.290, and, accordingly, the Cabinet properly applied the retroactivity provisions of the statute.

## UNLAWFUL SINGLING–OUT OF MONUMENTAL

 Monumental alleges that the Cabinet is singling them out for tax treatment in violation of Section 171 of the Kentucky Constitution, which requires uniformity in taxation. It argues that "Post-*St. Ledger*, the simple fact is that in a state of 4 million residents, only Monumental is being taxed on the value of its stock assets; a plain violation of uniformity."

Monumental does not cite us to its preservation of this issue as required by CR 76.12(4)(c), nor does it provide citations to any of the evidence in the record which allegedly supports this argument. Accordingly, we will not address this issue upon the merits.

## ACCORD AND SATISFACTION

Monumental contends that the Cabinet's re-audits and tax liability assessments for the years 1995–1998 are barred by the doctrine of accord and satisfaction. It alleges that because following the initial audits the Cabinet "stated at the administrative protest(s) the amount it would accept in full payment of Monumental's obligation" was an accord, and Monumental's subsequent satisfaction of that amount by payment or tax credit was a satisfaction.

10. Citations to record omitted.

 Under the doctrine of accord and satisfaction, "[a]n offer in satisfaction of a claim must be accompanied by an express condition that the acceptance is in full satisfaction of the claim and that the offeree takes the money subject to such condition. In lieu of an express condition, the circumstances must clearly indicate to the creditor that this condition is present." *Bruestle v. S & M Motors, Inc.*, 914 S.W.2d 353, 354 (Ky.App.1996) (quoting *Rauch v. Shots*, 533 N.E.2d 193, 194 (Ind. Ct.App.1989)); *Liggons v. House & Associates Ins.*, 3 S.W.3d 363, 365 (Ky.App. 1999).

We do not believe that the doctrine of accord and satisfaction is applicable under the facts of this case. KRS 132.290 sets forth by statute the procedures relevant to omitted property. The statute does not prevent re-audits, and Monumental cites us to no authority which would prevent the procedures undertaken by the Cabinet to assess back taxes. As previously discussed, the Board found Monumental at fault for failing to report the underlying details of its separate accounts account and for failing to include applicable items in its KRS 136.320 filings. As the new information came to light, the Cabinet was, we believe, entitled to follow the statutory provisions contained in KRS 132.290 to assess back-taxes.

*KRS 131.081*

 Monumental contends that the assessment of deficiency interest added to the assessed tax for the years 1995–1998 must be abated pursuant to KRS 131.081(8), a part of the "Tax Payers' Bill of Rights." It alleges that "KRS 131.081(8) . . . automatically abates penalties and interest which arise due to a taxpayer's reasonable reliance on written advice received from the Cabinet."

Though KRS 131.081 was amended in 1998, 2000, 2005, and 2006, Section (8) has provided throughout this period as follows:

(8) The department shall include with each notice of tax due a clear and concise description of the basis and amount of any tax, penalty, and interest assessed against the taxpayer, and copies of the agent's audit workpapers and the agent's written narrative setting forth the grounds upon which the assessment is made. Taxpayers shall be similarly notified regarding the denial or reduction of any refund or credit claim filed by a taxpayer.

The provision does not appear to address the issue of interest and penalty abatement. In any event, Monumental does not cite us to the written advice from the Cabinet it relied upon in failing to properly report its separate accounts in its filings. Hence we are unpersuaded by this argument.

### CONCLUSION

For the foregoing reasons the judgment of the Franklin Circuit Court is affirmed.

BUCKINGHAM, Senior Judge, Concurs.

THOMPSON, Judge, Dissents and files Separate Opinion.

THOMPSON, Judge, Dissenting:

I respectfully dissent. I have no doubt that the Kentucky legislature has repealed taxation on stock owned by shareholders of corporations, which includes Monumental. In addition, the taxation of Monumental's separate account is repugnant to basic principles of taxation. The separate account consists of pension funds and annuities placed in the account by Monumental on behalf of the plan participants. Because the Legislature has abolished taxes on the value of stock held by shareholders

in this state, each of these tax computations are a direct or indirect taxation of shareholders.

Initially, I believed the trial court utilized an improper method to review the findings of the administrative agency herein. The trial court erroneously applied the substantial evidence standard of review to all issues raised by the parties. The issues raised are questions of law, fact, or mixed questions of law. As to the questions of law, when an issue is purely one of interpretation of law or presents a mixed question of law and fact, our review is de novo. *Epsilon Trading, Inc. v. Revenue Cabinet*, 775 S.W.2d 937 (Ky.App.1989).

As the majority recognizes, *St. Ledger* involved the commerce clause and KRS 132.020. However, our Supreme Court provided further analysis and reaffirmed the expressed public policy of the Commonwealth against double taxation as it applies to taxation of a corporation and its shareholders. Although there is no constitutional provision forbidding double taxation, public policy dictates that taxation of the same property twice not be enforced except in cases where the legislature has clearly declared a contrary policy. *City of Louisville v. Aetna Fire Ins. Co.*, 284 Ky. 154, 143 S.W.2d 1074 (1940). So strong is the public policy that if the legislative intent is less than clear, a "statute should be construed so as to avoid double taxation in any form." *Kentucky Power Company v. Revenue Cabinet*, 705 S.W.2d 904 (Ky. 1985).

I am convinced that the legislature has, without exception, re-affirmed its intent to avoid double taxation of our citizens. Post-*St. Ledger*, the exemption statute was repealed and reference to stock deleted from KRS 132.020. In doing so, it must be presumed that the legislature was aware of the *St. Ledger* decision. *St. Clair v. Commonwealth*, 140 S.W.3d 510 (Ky.2004). Although it could have equally taxed both in-state and out-of-state corporations and their shareholders, the legislature chose to eliminate the tax on shareholders on the value of their corporate shares and adhere to this Commonwealth's public policy against double taxation.

The majority believes the Supreme Court's opinion was limited strictly to KRS 132.020 but I am not persuaded. Our highest Court's intent was to declare all ad valorem taxes on the ownership of corporate shares forbidden unless the legislature clearly states to the contrary. If, as the majority suggests, our judicial opinions are limited to the facts presented without bearing on future cases, our law is destined to stagnation and no longer a moving stream guided in its journey by precedent. *See Hilen v. Hays*, 673 S.W.2d 713, 718 (Ky.1984).

Applying the mathematical computation performed by the Cabinet, Monumental's stock was not merely "exposed" to taxable assets; it was transformed into a taxable asset. The majority ignores the testimony of the lone expert, Professor Richard Pomp, who affirmatively testified that the exemption method used by the Cabinet resulted in the taxation of stock. He explained:

> If this were as simple as on line one you include the shares and on line 2 you exclude the shares then obviously you have eliminated the effect of the shares. But that is not what is going on here at all. The calculation is much more complicated that that. And because of the complication, excluding the shares has a different impact from exempting the shares. Excluding the shares means taking the shares out of the calculation entirely. Exempting means treating them wherever the word exempt appears in the formula as being put in that

part of the process, that step in the formula.

And whether you treat it as excluded or you treat it as exempt, mathematically it has a very different effect. That's the first part of this case.

And, therefore, it really follows as a matter of logic that if you exclude the shares, you get a lower tax. But if you exempt the shares and you get a higher tax, then the exemption is a way of indirectly taxing the shares. The exemption does not have a neutral effect in this case.

It does lead to a higher tax compared to excluding the shares.

An applicant before an administrative agency bears the burden of proof and must provide sufficient evidence to establish a prima facie case for the relief sought. *See City of Louisville, Div. of Fire v. Fire Service Managers Assoc. ex rel. Kaelin,* 212 S.W.3d 89, 94 (Ky.2006); *Danville–Boyle County Planning and Zoning Commission v. Prall,* 840 S.W.2d 205 (Ky. 1992). However, Monumental established through the testimony of Professor Pomp that it was entitled to the relief sought, and the Cabinet elected not to introduce any expert testimony.

In reliance on the sole expert testimony, I believe that the majority's understanding of this rather complex computation is amiss and is unsupported by evidence in the record. There is an undesirable consequence of including stock in the tax computation: a portion of taxable reserves is shifted to taxable capital when the stock is exempted rather than excluded. Because of the difference in the tax rates under the statute, the exemption method results in a substantially higher tax. Indeed, if there were no difference in the tax consequences if either method were used, there would be no controversy.

The majority states in its opinion that following the finality of *St. Ledger,* Monumental adopted the position that all stock assets should be excluded from the ad valorem tax calculations imposed under KRS 136.320. This statement is in error. Before *St. Ledger,* Monumental and the Cabinet adopted the position that all stock assets should be excluded from ad valorem tax calculations. It was only after *St. Ledger* that the Cabinet adopted the position that stock assets should be included in the ad valorem tax calculations imposed under KRS 136.320.

Although KRS 136.320 does not impose a direct tax on stock, the majority's interpretation permits an indirect tax that is equally offensive. A state cannot tax indirectly that which it cannot tax directly. *See Square D Co. v. Kentucky Board of Tax Appeals,* 415 S.W.2d 594, 599 (Ky. 1967). Thus, I would hold that to avoid double taxation, shares of stock must be excluded rather than exempted, under KRS 136.320.

The majority recites that the result of excluding shares is illogical. I disagree. Both state and federal tax laws permit taxpayers to allocate assets into non-taxable sources. Two common situations support my statement. While two taxpayers may own the same amount of assets, one may own more non-taxable bonds. Likewise, two citizens may earn the same income yet one pays lower taxes because of contributions to retirement accounts, depreciation of real estate, interest expenses, etcetera.

I am also in disagreement with the majority's reasoning and result regarding the taxation of the separate account. In my opinion, this once again constitutes double taxation.

A purchaser of an annuity or a contributor to a pension plan has paid taxes or has deferred the payment of taxes on the

funds invested in the annuity or pension plan. These funds are placed into the care and custody of Monumental Insurance Company. To again tax these funds as an asset of Monumental Insurance Company constitutes double taxation of the participant in the retirement plan or annuity and diminishes the income to that third party by the taxation of the account.

If an individual desires to establish a pension plan and places his pension plan into the trust of his stockbroker or his bank and designates that shares of stock be purchased by his pension plan for his retirement, those shares will not be taxed. However, if that same person were to invest his pension plan with Monumental who utilizes their expertise to invest shares of stock on his behalf for his retirement, then his shares will be taxed. This is unequal taxation and in direct violation of the legislature's mandate that the value of the possession of shares of stock not be taxed.

The majority places blame on Monumental for its failure to report the assets. The facts, however, demonstrate that Monumental did not pay taxes on the separate account because the Cabinet deemed the account not to be taxable. The majority ignores what I consider to be the crucial facts.

Professor Pomp testified that separate accounts are similar to reserves in that the assets in the accounts are not operating capital but are held for the payment of retirement benefits.

Dennis Van Meighem is a specialist in the taxation of insurance companies. He testified that a separate account is a segregated account, distinct from the company's liabilities and assets. The records of the account are kept in a "green book" and all gains and losses are allocated solely to that account. A separate account is distinctive in the respect that its liabilities are always equal to its assets. Any gains from the account are transferred to the company's "blue book" which reflects the company's operating capital. As a result, there is no net worth attributable to a separate account. The legal owner of the assets is the insurance company, which has the ability to execute investment decisions but the equitable owner is the contract holder; the third party participant in the pension plan or the annuity.

Colleen Lyons, who was employed by Monumental in the tax department from 1984 through 1998, testified that in preparation for the company's capital stock tax return, she did not include the company's separate account and had never received any notice from the Cabinet that it considered separate accounts taxable.

Nancy Moore Marshall testified to facts relevant to the Cabinet's treatment of separate accounts for the purpose of calculating capital stock tax. From 1980 through 1998, she worked in the division of the Cabinet that mandated the capital stock tax. During those eighteen years, she was unaware of the Cabinet taxing any separate accounts.

James Livers testified that in the 1980's or 1990's the issue arose as to whether separate accounts should be included in the capital stock tax. Apparently, the issue was affirmatively resolved and the tax was applied to at least one taxpayer. However, there was no documentation to support his recollection. Mr. Livers excused the Cabinet's failure to previously impose a tax on Monumental's separate account to an oversight by the Cabinet.

I also do not believe that because KRS 304.15–390 designates the insurer as the "owner" of the separate account, the assets are necessarily taxed under KRS 136.620. KRS 136.320(1) requires that an insurance company report the fair cash value of "all

money in hand, shares of stock, notes, bonds, accounts, and other credits...." "Fair cash value" is the value of the property to a buyer who "would obtain by his purchase the same interest held by the seller, and would also obtain thereby all of the rights of the seller." *Commonwealth ex rel. Reeves v. Sutcliffe*, 287 Ky. 809, 155 S.W.2d 243, 245 (1941).

Applying the definition to this case, even if the separate account could be sold, a buyer of Monumental's interest would obtain only legal title and not the value of the assets. This distinction was noted in *Kentucky Power Co. v. Revenue Cabinet*, 705 S.W.2d 904 (Ky.1985), wherein the Court recognized that legal title and equitable title have different monetary values. When legal and equitable title are separated the "legal interest is virtually worthless because of itself it owns nothing and can exercise no control over the property." Id. at 905.

The title vested in Monumental is solely for the purpose of managing the investments in the account for the benefit of the equitable title holders, the retirement/pension beneficiaries. As revealed by the expert testimony, Monumental cannot fund its operating capital from the assets or otherwise pay its debt from that source. A buyer would receive nothing more. In a similar situation, if Monumental were to enter into a bankruptcy, these accounts would not constitute an asset of the bankruptcy estate. Similarly, if a creditor obtained a judgment against Monumental, they could not execute or attach these separate accounts to collect their judgment. Thus, the specification of Monumental as the owner of the separate account does not include it within the ambit of KRS 136.320.

Moreover, absent from KRS 136.320 is any reference to separate accounts. Although separate accounts may consist of cash, stock, bonds and other intangibles, it is obvious from the legislature's enactment of KRS 304.15–390 that it recognized a separate account as a distinct financial unit unique to domestic life insurers. Thus, it is reasonable to construe the statute in a way to exclude separate accounts.

Until Monumental filed its protest claiming a refund substantially higher than that calculated by the Cabinet, it had never been taxed on its separate account assets. Although its green book was not submitted with its return on an annual basis, Monumental provided its blue book which advised the Cabinet of its separate account retirement assets. Yet, the Cabinet consistently failed to request that Monumental submit its green book or any other documents detailing the contents of its separate account. For over twenty years, which included audit years, the Cabinet never questioned the omission of the separate account.

In my opinion, the actions of the Cabinet have a strong implication of retaliation and the contentious proceedings before the Board constitutes arbitrary conduct toward Monumental.

In conclusion, I would reverse the decision of the circuit court and remand the case to the Cabinet for a calculation of the Monumental's refund based on the exclusion of its stock assets, plus any interest owed. I would further hold that the Cabinet cannot tax Monumental's separate account.