Carlos Andrew PERDUE, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2012–CA–001031–MR.

Court of Appeals of Kentucky.

Sept. 27, 2013.

Gene Lewter, Frankfort, KY, for Appellant.

Jack Conway, Attorney General of Kentucky, James Havey, Assistant Attorney General, Frankfort, KY, for Appellee.

Before LAMBERT, TAYLOR, and VANMETER, Judges.

## OPINION

LAMBERT, Judge:

Carlos Andrew Perdue has directly appealed from the final judgment of the Fayette Circuit Court convicting him of the misdemeanor offenses of resisting arrest, possession of drug paraphernalia, and second-degree disorderly conduct and fixing his punishment to an indeterminate sentence of twelve months, probated for two years. Perdue contends that the trial court should have granted a directed verdict on the resisting arrest and disorderly conduct charges and that the jury was improperly instructed on the possession of drug paraphernalia charge. Finding no error, we affirm the conviction.

In July 2011, the Fayette County grand jury returned a four-count indictment against Perdue, charging him with First–Degree Promoting Contraband pursuant to Kentucky Revised Statutes (KRS) 520.050, Resisting Arrest pursuant to KRS 520.090, Possession of Drug Paraphernalia pursuant to KRS 218A.500, and Disorderly Conduct pursuant to KRS 525.055.[1] The charges arose from an incident on June 6, 2011, when police officers were serving an arrest warrant on Perdue at his mother's house on Crown Circle. Perdue became combative as the officers sought to place him in the cruiser, spitting on an officer and trying to kick the doors. Officers located a crack pipe in his pants pocket once they arrived at the jail, where he continued to act erratically.

The matter proceeded to a jury trial on April 23, 2012. The first witness to testify was Officer David Todd Hart, a patrol officer with the Lexington Division of Police. Officer Hart and Officer Rebecca McAllister were dispatched to 1205 Crown Circle on June 6, 2011, for an "attempt to pick up" Perdue pursuant to a district court warrant. He and Officer McAllister arrived separately, and they parked down the street from the house. A young boy answered Officer Hart's knock at the door, and Officer Hart entered the home. Officer Hart found Perdue in a back bedroom. He informed Perdue that he had a warrant for his arrest and asked him to get out of bed and get dressed so he could take him in. Perdue put on his pants and asked if he could pick up a pair of long underwear to take with him, which Officer Hart permitted him to do. Perdue placed the long underwear over his shoulder. Officer Hart chose not to put Perdue in handcuffs in the home because Perdue's son was present. Perdue agreed to go to the cruiser voluntarily.

When he and Perdue arrived at the cruiser, Officer Hart opened the door and explained that he needed to put him in handcuffs. Perdue agreed, and Officer Hart placed the handcuffs on him. Before he was able to search Perdue, Officer Hart noticed that the long underwear had a 2–inch long safety pin attached to it. Officer Hart told Perdue he would have to keep the long underwear with him in the front seat due to the presence of the safety pin until they reached the detention facility, when it could be placed with his personal belongings. At this point, Perdue because agitated and disruptive. Perdue began

---

1. This charge was amended to a Class B misdemeanor under KRS 525.060 at the beginning of trial.

yelling and spitting at Officer Hart, cursed at him, lunged at him, and tried to head-butt him. Officer Hart was not able to search Perdue and struggled to get him in the cruiser. Perdue's son watched from the front lawn. Officer Hart sustained minor injuries during the process, including scratches and scrapes on his arm. He went on to testify as to Perdue's behavior inside of the cruiser and at the detention center. During the search process at the detention center's booking station, a glass crack pipe with crack cocaine residue was found in Perdue's pocket.

Officer McAllister also testified for the Commonwealth. She is employed with the Lexington Division of Police as a patrol officer. She responded with Officer Hart on an "attempt to locate" on Crown Circle. She detailed the circumstances of Perdue's arrest, but she did not accompany Officer Hart to the jail with Perdue.

Brian Richardson was the next witness to testify. He was an officer in intake at the Fayette County Detention Center at the time of Perdue's arrest. He detailed Perdue's behavior in the detention center. Officer Richardson found the crack pipe in Perdue's pocket at the detention center during a search.

The last witness to testify for the Commonwealth was Christopher Ramsey. He is a chemist with the Kentucky State Police laboratory. He tested the black metal pipe found in Perdue's pocket and determined it contained cocaine residue. He noted that parts of it were charred and burned.

Perdue moved for a directed verdict at the close of the Commonwealth's case, arguing that there was insufficient evidence to support the charges. On the disorderly conduct charge, the Commonwealth contended that the jail was a "public place" pursuant to the statute; Perdue argued that it was not as it was not open to the general public. The trial court denied the motion as to the disorderly conduct charge, but did not decide the issue of whether the definition of "public place" required the location to be narrowed. Later, the court ruled that the detention center did not fit the definition of a public place, but the location on the street outside of the house where Perdue was arrested did meet the definition. For the drug paraphernalia charge, Perdue argued lack of knowledge on his part. The court ruled that there was sufficient evidence to go to the jury based upon the officer's testimony.

Perdue opted not to testify, but called two witnesses, including his mother, Wanda Perdue, and Major Nolan Hill, who works for the Fayette County Detention Center. Major Hill testified about the "amnesty box" and the detention center's standing order that if an inmate does not reach the "amnesty box," the detention center would not charge him with possession of anything found.

At the conclusion of his case, Perdue renewed his motion for a directed verdict on the same grounds, and the court again denied his motion. The parties then discussed jury instructions. Perdue argued that the word "knowingly" should be included in the possession of drug paraphernalia charge; the Commonwealth argued that the possession could be constructive and that the language in the instruction was from the statute. The court indicated it would research the issue, but it reasoned that if someone possesses something with the intent to use it, he knows he has it. Ultimately, the court did not include the word "knowingly" in the instruction for possession of drug paraphernalia.

The jury found Perdue not guilty on the charge of promoting contraband, but guilty of resisting arrest, possession of drug par-

aphernalia, and second-degree disorderly conduct.[2] The jury fixed his punishment at twelve months in the county jail for the resisting arrest and possession of drug paraphernalia convictions and at ninety days for the disorderly conduct conviction. The trial court entered a final judgment and sentence of probation on June 1, 2012, sentencing Perdue to a twelve-month term in accordance with the jury's recommendation. The court noted that Perdue had been in custody for 160 days and probated the remainder of his sentence for two years, subject to several stated conditions. This direct appeal now follows.

## A. DIRECTED VERDICT RULINGS

The Supreme Court of Kentucky set forth the directed verdict rule as well as the appellate court's standard of review in *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991), citing *Commonwealth v. Sawhill,* 660 S.W.2d 3 (Ky.1983).

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.
>
> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

*See also Wilburn v. Commonwealth,* 312 S.W.3d 321, 323 (Ky.2010); *Hedges v. Commonwealth,* 937 S.W.2d 703, 707 (Ky. 1996).

## 1. Resisting Arrest

Perdue contends that the Commonwealth failed to meet its burden on the resisting arrest charge because he had already been arrested and was in custody when he went into a rage. The Commonwealth disputes this argument, contending that "effecting an arrest" is not an instantaneous act, but is a process that had not concluded when Perdue went into the rage.

 The question before the Court on this issue relates to the interpretation of KRS 520.090(1), and the law related to statutory interpretation is well-settled in the Commonwealth. "The primary purpose of judicial construction is to carry out the intent of the legislature." *Monumental Life Ins. Co. v. Dept. of Revenue,* 294 S.W.3d 10, 19 (Ky.App.2008). In doing so, a court "must consider the intended purpose of the statute-and the mischief intended to be remedied. A court may not interpret a statute at variance with its stated language." *Id.,* citing *SmithKline Beecham Corp. v. Revenue Cabinet,* 40 S.W.3d 883, 885 (Ky.App.2001) (internal quotations omitted). Furthermore, "[t]he first principle of statutory construction is to use the plain meaning of the words used in the statute." *Id.,* citing *Revenue Cabinet v. O'Daniel,* 153 S.W.3d 815 (Ky.2005); KRS 446.080(4). The interpretation of a statute is a matter of law, which we review *de novo. Commonwealth v. Garnett,* 8 S.W.3d 573, 575–76 (Ky.App.1999); *Monumental Life Ins. Co.,* 294 S.W.3d at 16, citing *Gosney v. Glenn,* 163 S.W.3d 894, 898 (Ky.App.2005); *Reis v. Campbell*

**2.** We note that the final judgment incorrectly states that Perdue was convicted of first-de-gree disorderly conduct rather than second-degree disorderly conduct.

*County Bd. of Educ.*, 938 S.W.2d 880 (Ky. 1996).

KRS 520.090(1) codifies the misdemeanor charge of resisting arrest:

A person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a peace officer, recognized to be acting under color of his official authority, from effecting an arrest of the actor or another by:

(a) Using or threatening to use physical force or violence against the peace office or another; or

(b) Using any other means creating a substantial risk of causing physical injury to the peace officer or another.

Here, Perdue does not dispute that he used physical force or violence against Officer Hart. Rather, Perdue's argument rests on his assertion that he had already been arrested when he used this force against the officer.

The Commonwealth cites to several out-of-state cases addressing when an arrest is effected for purposes of the resisting arrest statute, which we have reviewed. In *State v. Mitchell*, 204 Ariz. 216, 62 P.3d 616, 618–20 (Ariz.Ct.App.2003), the Court of Appeals of Arizona interpreted Arizona's version of the resisting arrest statute. The question in *Mitchell* was whether the handcuffed defendant's arrest had been "effected" when he began to fight while officers were escorting him to the cruiser. Similar to Kentucky's statute, the resisting arrest statute in Arizona provides that a person commits the offense of resisting arrest by "intentionally preventing or attempting to prevent a person reasonably known to him to be a peace officer, acting under color of such peace officer's official authority, from effecting an arrest by: 1. Using or threatening to use physical force against the peace officer or another[.]" Arizona Revised Statutes (A.R.S.) § 13–2508. Also similar to the arguments

in this case, Mitchell contended that because he had already been handcuffed, the arrest was complete, and he could not be convicted of resisting arrest and was entitled to a judgment of acquittal, while the State argued that the officers were in the process of "effecting" Mitchell's arrest when he began resisting them. *Mitchell,* 62 P.3d at 618. The court went on to interpret the meaning of "effecting an arrest."

In order to determine the intent of the legislature, the Arizona court considered the plain meaning of the statute. The court stated the definition of the word "effect" as "to bring about, to produce as a result, or to cause." *Id.,* citing BLACK'S LAW DICTIONARY 532–33 (7th ed.1999); WEBSTER'S NEW WORLD DICTIONARY (Neufeldt & Guralnik eds., 3rd ed.1988). With this definition in mind, the court stated:

Based on the language of A.R.S. § 13–2508 and the common meaning of the verb "effect," we construe the term "effecting" in § 13–2508 to mean an ongoing process toward achieving, producing, making, or bringing about, an arrest. *See Lewis v. State,* 30 S.W.3d 510, 512 (Tex.App.2000) ("effecting an arrest" entails a process or transaction and the conduct alleged to be resisting arrest must occur after the arrest process begins but before the process ends); *see also State v. Bay,* 130 Ohio App.3d 772, 721 N.E.2d 421, 422 (1998) (resisting arrest charge arose from incident 15 to 30 minutes after police handcuffed defendant). Until the arrest has been "effected," the arrest process remains ongoing and the resisting arrest statute is applicable. *See Lewis,* 30 S.W.3d at 512.

*Id.* at 618. The court concluded that "effecting an arrest" "is a process with a beginning and an end. Often, the process is very brief and the arrest is quickly completed. In some situations, however,

the process of 'effecting' an arrest will occur over a period of time and may not be limited to an instantaneous event, such as handcuffing." *Id.* (citations omitted).

The Arizona court then considered the legislature's purpose in creating the resisting arrest statute. "The purpose of the resisting arrest statute is to protect peace officers and citizens from substantial risk of physical injury. Adopting Mitchell's argument—that the arrest was already completed because he was handcuffed—would limit the protection provided by § 13–2508 and fail to achieve the legislative intent." *Id.* at 619 (internal citation omitted). The court recognized that "[d]etermining *when* an arrest process has been completed requires a case-by-case analysis of the facts in the light of the 'effecting an arrest' language from § 13–2508." *Id.* (citation omitted, emphasis in original). It ultimately declined "to articulate a 'bright-line' rule for determining when an arrest has been completed—effected—for resisting arrest purposes." *Id.* Furthermore, the court differentiated between when an arrest had been made for purposes of search and seizure law and when an arrest had been effected for purposes of the resisting arrest law: "A person may be 'under arrest' and entitled to certain constitutional rights and privileges, but for purposes of the crime of resisting arrest in Arizona, the arrest may not yet have been 'effected' on the same person." *Id.* at 620. The court upheld the trial court's denial of Mitchell's motion for a judgment of acquittal, stating as follows:

> In this case, there was evidence that only a few seconds elapsed between the handcuffing and the violent struggling by Mitchell. This evidence is sufficient to support a jury finding that Mitchell had not submitted and was not successfully restrained. Thus, a reasonable jury could find that the officers were still "effecting" Mitchell's arrest when he began struggling with them. The trial court correctly denied Mitchell's motion for judgment of acquittal.

*Id.* at 619 (footnote omitted).

In *State v. Lindsey,* 158 N.H. 703, 705–08, 973 A.2d 314, 316–18 (2009), the Supreme Court of New Hampshire addressed the same issue, analyzing the plain meaning of New Hampshire's version of the resisting arrest statute and the policy behind it. The Court noted that, "[l]aw enforcement officers may confront a myriad of scenarios when seeking to effect an arrest or detention, including volatile situations that can change in an instant, especially when they are exerting physical control over an individual." *Id.* at 317. It further noted that New Hampshire's resisting arrest statute "reflects the policy that individuals follow the commands of law enforcement officials, because doing so fosters the effective administration of justice, discourages self-help, and provides for the safety of officers." *Id.* (internal quotation marks and citation omitted).

As the Arizona court did in *Mitchell,* the Supreme Court of New Hampshire construed the phrase "seeking to effect an arrest or detention" to include "the entire course of events during which law enforcement officers seek to secure and maintain physical control of an individual, attendant to accomplishing the intended law enforcement duty." *Id.* at 317 (citations omitted). The Court determined that this question must be determined on a case-by-case basis by "objectively viewing the continuum of events as a whole." *Id.* (citations omitted). Rejecting the defendant's construction of the statute—that "all resistance which occurs after the moment in which an individual comes under the control of law enforcement officers is no longer culpable under the resisting arrest statute"—the

court declared that "[t]his construction neither accords with the fair import of the statute nor promotes justice." *Id.* The New Hampshire court held that a rational jury could have concluded that the arrest was still in progress when the defendant began struggling with the officers while handcuffed on the basis of the following facts:

> From the moment the police entered the apartment, they faced a continuing, volatile encounter with the defendant. He was yelling and pointing a seven-inch bladed knife. He refused numerous commands at gun point to drop the knife. He failed to comply with orders to go to the floor and ultimately was forced to do so and handcuffed. He was briefly left face down on the floor so that the officers could continue to secure the area by detaining the other individuals at the scene. Suddenly, he resumed his yelling, attempted to get off the floor where he had been instructed to stay, and was kicking, pushing and "bull-rushing" at a police officer. Finally, once forced to return to the floor and allowed to sit up, he calmed down completely.

*Id.* at 318 (citations omitted).

 We are persuaded by the above-cited case law that "effecting an arrest" is a process that does not necessarily end when a defendant has been handcuffed, and we adopt the reasoning of the Arizona and New Hampshire courts as set forth above. Applying the law to the facts of this case, we must agree with the Commonwealth that Officer Hart had not yet effected Perdue's arrest when Perdue became enraged and began kicking and yelling. While Perdue was certainly in custody when the officers escorted him out of his mother's house, Officer Hart had yet to handcuff or search Perdue prior to placing him in the cruiser. Perdue became combative towards Officer Hart just after being handcuffed while standing next to the open door of the cruiser. This occurred when Officer Hart realized he needed to remove the long underwear from Perdue's shoulder because of the presence of the safety pin. Perdue began lunging at Officer Hart, tried to head-butt him, and began yelling and spitting at him. Officer Hart stated that he was unable to search Perdue before placing him in the cruiser, which he described as a struggle. We agree with the Commonwealth that reasonable jurors could have concluded that Perdue had used physical force or violence in an attempt to prevent Officer Hart from effecting his arrest; therefore, we hold that the trial court properly denied Perdue's motion for a directed verdict on the charge of resisting arrest.

2. Disorderly Conduct

 Next, Perdue contends that he was entitled to a directed verdict on the disorderly conduct charge, arguing that the trial court's instruction describing the location of the offense as 1205 Crown Circle, his mother's address, as a public place was incorrect. The Commonwealth disagrees, pointing out that the trial court narrowed the location of the offense in the jury instructions to what occurred on the street, rather than in the detention center, and that Perdue failed to object to the portion of the jury instructions listing 1205 Crown Circle as the location where he allegedly created a hazardous or physically offensive condition. As the Commonwealth argues in its brief:

> A directed-verdict motion is reviewed in light of the proof at trial and the statutory elements of the alleged offense. *Lawton v. Commonwealth,* 354 S.W.3d 565, 575 (Ky.2011). The directed-verdict question is not controlled by the law as described in the jury instructions, but by the statutes creating the

offense. *Id.* Thus, a directed verdict may be inappropriate even though the jury instructions were flawed. *Id.*

*Acosta v. Commonwealth,* 391 S.W.3d 809, 816 (Ky.2013). Therefore, our review is limited to the elements of the statutory offense as applied to the proof introduced at trial, without regard to the language in the jury instructions.

KRS 525.060(1) provides for the misdemeanor offense of second-degree disorderly conduct:

A person is guilty of disorderly conduct in the second degree when in a public place and with intent to cause public inconvenience, annoyance, or alarm, or wantonly creating a risk thereof, he:

(a) Engages in fighting or in violent, tumultuous, or threatening behavior;

(b) Makes unreasonable noise;

(c) Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard, or other emergency; or

(d) Creates a hazardous or physically offensive condition by any act that serves no legitimate purpose.

KRS 525.010(2) and (3) provide the definitions for both "public" and "public place," respectively. "Public" is defined as "affecting or likely to affect a substantial group of persons[,]" and "public place" is defined as:

a place to which the public or a substantial group of persons has access and includes but is not limited to highways, transportation facilities, schools, places of amusements, parks, places of business, playgrounds, and hallways, lobbies, and other portions of apartment houses and hotels not constituting rooms or apartments designed for actual residence. An act is deemed to occur in a public place if it produces its offensive or

proscribed consequences in a public place.

■■■ We note that the trial court rejected the Commonwealth's argument that the detention center constituted a public place during the directed verdict stage, despite the Commonwealth's argument that it was one. Therefore, the trial court determined that the only location that would fit within the definition of "public place" was the location on the street by Perdue's mother's house on Crown Circle. We find no error in this ruling. The court properly narrowed the area for the disorderly conduct charge to the location around the cruiser where the offensive conduct took place. The cruiser was parked on a residential road near Perdue's mother's house. This location certainly meets the definition of "public place," and Perdue's offensive conduct at issue, including kicking and yelling, occurred outside of the police cruiser on the street, which members of the public had the right to access.

■■■ Perdue also contends that his actions did not meet the "public" element because no one else was in the area when the behavior began. The Commonwealth argues that the location on Crown Circle met the definition of "public" because Perdue's offensive conduct occurred in a location where the public would have access— a residential street—and that Perdue was attempting to insert a new element into the statute. We reject this argument by Perdue because the statute does not include an element that a member or members of the public actually be affected by the behavior; rather, the conduct must at a minimum be "likely to affect a substantial group of persons." KRS 525.010(2).

Accordingly, the trial court did not commit error in denying Perdue's motion for a directed verdict on the disorderly conduct charge.

## B. JURY INSTRUCTIONS

 Perdue's last argument addresses whether the jury was properly instructed on the possession of drug paraphernalia charge. He argues that the word "knowingly" should have been included in the instruction, but the trial court declined to do so. The Commonwealth argues that the trial court properly declined to add a new element to the offense that was not included in the statutory language. Our standard of review on this issue is *de novo*. *See Howell v. Commonwealth*, 296 S.W.3d 430, 432–33 (Ky.App.2009), citing *Hamilton v. CSX Transportation, Inc.*, 208 S.W.3d 272, 275 (Ky.App.2006) ("alleged errors regarding jury instructions are considered questions of law that we examine under a *de novo* standard of review").

KRS 218A.500(2) provides:

It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia for the purpose of planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packing, repacking, storing, containing, concealing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance in violation of this chapter.

In Instruction 6, the trial court instructed the jury on this charge:

You will find the Defendant guilty of Use of Drug Paraphernalia under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about the 6th day of June, 2011 and within 12 months before the finding of the Indictment herein, the Defendant possessed with the intent to use a crack pipe;

AND

B. That he did so with the intent to use it to inhale crack cocaine into his body.

Perdue relies upon the unpublished case of *Russell v. Commonwealth*, 2010 WL 3717271 (2009–CA–001536–MR) (Ky.App. Sept. 24, 2010), to support his argument that the trial court should have included "knowingly" in the instruction with regard to his possession of the crack pipe. However, as the Commonwealth aptly points out, this Court in *Russell* did not address the jury instructions but instead addressed whether the prosecutor committed prosecutorial misconduct by misstating the law during closing arguments. And while the possession of drug paraphernalia instruction in *Russell* did contain the word "knowingly," the issue of whether the instruction was correct was not before this Court.

 In the present case, the instruction certainly embodied the language of the statute when it provided that the jury must find that Perdue "possessed with the intent to use a crack pipe" in order to find him guilty of the offense. We find no error in the trial court's instruction or in the rationale for excluding an additional term from the instructions.

For the foregoing reasons, the judgment of the Fayette Circuit Court is affirmed.

ALL CONCUR.