RENDERED: SEPTEMBER 5, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1304-MR

MARION GAIL SMITH                                          APPELLANT

|  | APPEAL FROM FAYETTE CIRCUIT COURT |
|---|---|
| v. | HONORABLE KIMBERLY N. BUNNELL, JUDGE |
|  | ACTION NO. 22-CI-01381 |

BELINDA L. SHIRKEY, M.D. AND
RETINA AND VITREOUS
ASSOCIATES OF KENTUCKY, PLLC
D/B/A RETINA ASSOCIATES OF
KENTUCKY                                                    APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; ACREE AND MOYNAHAN,
JUDGES.

MOYNAHAN, JUDGE:  This is a medical negligence case.  The Appellant,

Marion Gail Smith ("Smith"), appeals from a Fayette Circuit Court verdict and

judgment that held the Appellee, Dr. Belinda L. Shirkey, M.D. ("Shirkey"), did not

fail to meet her duty of care when she evaluated Smith for post-surgical

complications.  After careful review, we AFFIRM the verdict and judgment of the Fayette Circuit Court.

## BACKGROUND

Dr. Thomas Abell performed cataract removal surgery on Smith's right eye on May 17, 2021.  During the operation he injected a steroid medication into the eye to mitigate post-surgical swelling.  On June 4, 2021, Smith visited Dr. Abell's office, complaining of worsening vision.  Dr. Michael Tanner, an ophthalmologist with Abell Eyes, examined her and, observing a slight elevation of the retina, referred her to a same day appointment at Retina and Vitreous Associates of Kentucky, PLLC ("RAK").  Dr. Tanner testified that there were no holes or tears in Smith's retina, and that he did not suspect a retinal detachment ("RD") on that day.  However, RAK had more powerful imaging technology that would provide a clearer look at the area with the anomaly.  Dr. Tanner instructed Smith to visit RAK for testing that afternoon and return to Abell Eyes in one week for follow-up.

Shirkey, a physician with RAK, evaluated Smith on June 4, 2021.  After examination and imaging, Shirkey concluded that Smith's visual issues stemmed from residual effects of the surgical steroid injection and would resolve as the drug dissolved within her eye.  She testified that there was no tear or detachment present on June 4, 2021.  She further stated that Smith was temporarily

at increased risk of RD due to her recent cataract surgery and needed regular follow-up visits. Shirkey explained the elevated risk level to Smith and told her to return in one week to be re-evaluated. Smith indicated that she preferred to stay with Dr. Abell's practice. Shirkey said that was fine but emphasized that Smith had to be seen somewhere for follow-up in one week and would require close monitoring while she continued to heal from the cataract surgery. Smith said she would book an appointment with Abell Eyes the next morning. Shirkey told her she was welcome to return to RAK at any time if she needed care, and the appointment ended.

Smith did not return to either Dr. Abell's office or to RAK in one week. She returned to Dr. Abell's office on June 23, 2021, more than two weeks later, complaining of vision loss. Dr. Abell observed an RD and immediately referred her to RAK. Dr. Blake Isernhagen of RAK ultimately performed a successful re-attachment surgery. Although left with residual visual impairment, Smith testified that she is still able to read, drive, travel, and perform the necessary activities of daily living.

Smith filed a complaint for medical negligence that named both Shirkey individually, and the entire RAK medical practice group collectively, as defendants. She alleged that Shirkey failed to provide the appropriate standard of

care to her when she did not diagnose an "impending" RD on June 4, 2021, resulting in permanent visual impairment.

## PROCEDURAL HISTORY

The case was tried before a jury in Fayette Circuit Court on September 23-26, 2024. Ten jurors found that Shirkey did not fail to comply with her duty of care when she evaluated Smith on June 4, 2021. Therefore, the circuit court entered a Trial Verdict and Judgment in favor of Shirkey and RAK. No post-trial motions were filed. Smith filed a Notice of Appeal with this Court on October 30, 2024.

## STANDARD OF REVIEW

Smith asserts two separate issues on appeal. First, she argues that the trial court issued erroneous jury instructions when it included the words "vitreoretinal surgery" in an instruction. Second, she contends that the trial court erred by excluding certain portions of Dr. Tanner's testimony from jury consideration.

Alleged errors in jury instructions are considered questions of law which we review *de novo*. *Perdue v. Commonwealth*, 411 S.W.3d 786 (Ky. App. 2013). *See also Howell v. Commonwealth*, 296 S.W.3d 430, 432-33 (Ky. App. 2009) (citing *Hamilton v. CSX Transportation, Inc.*, 208 S.W.3d 272, 275 (Ky.

App. 2006), and *Reece v. Dixie Warehouse and Cartage Co.*, 188 S.W.3d 440 (Ky. App. 2006)).

We review a trial court's decisions on the admission and exclusion of evidence under an abuse of discretion standard. *Clephas v. Garlock, Inc.*, 168 S.W.3d 389, 393 (Ky. App. 2004). Further, "[t]he test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

## ANALYSIS

### I. Jury Instruction

Smith requested the jury be instructed that Shirkey's duty was to exercise the level of care and skill expected of "a reasonably competent physician specializing in ophthalmology and acting under the same or similar circumstances."

The actual jury instruction issued by the trial court reads: "It was the duty of the Defendant Belinda L. Shirkey, M.D., when treating the Plaintiff Marion Gail Smith, to exercise the degree of care and skill expected of a reasonably competent physician specializing in ophthalmology **and vitreoretinal surgery** and acting under the same or similar circumstances." (Emphasis added.)

Smith argues that holding Shirkey to any standard other than that of a general ophthalmologist is inconsistent with American Board of Medical Licensure standards and also unfairly led the jury to ascribe more expertise and credibility to Shirkey, resulting in prejudicial error.

Interestingly, it is true that there is no formal board certification, or any official specialty of practice designation, for retina-focused practitioners in the United States. Several ophthalmologists testified, both in depositions and at trial, that retina specialists typically complete a one-to-two-year fellowship beyond the standard medical residency in ophthalmology. This means the standard of care for an ophthalmologist specializing in retinal medicine and surgery is the same standard of care as a general ophthalmologist who completed an ophthalmology residency. Since board certification is not a possibility at present, there are no established standards for consideration of post-residency specialty fellowships in licensing or legal settings.

In *Blair v. Eblen*, 461 S.W.2d 370, 373 (Ky. 1970), Kentucky's then highest court defined the medical standard of care as "a duty to use that degree of care and skill which is expected of a reasonably competent pract[it]ioner in the same class to which he belongs, acting in the same or similar circumstances." The Court further held: "we will leave determination of the standard to the medical profession and not the lay courts." *Id*.

It is not wrong for a licensed ophthalmologist in good standing to claim a specialty in vitreoretinal surgery if they are qualified to do so. However, the medical licensure and certification agencies in this country do not currently recognize this specialty. By including vitreoretinal surgery terminology in its instruction, the trial court established a medical standard in the absence of any guidance from the medical community, thereby failing to leave determination of the proper standard to the medical profession as required by *Blair*.

Although we find the jury instruction technically inaccurate for this reason, we do not agree that its inaccuracy results in reversible error. "The purpose of instruction is to fairly present to the jury the legal issues involved." *Cobb v. Hoskins*, 554 S.W.2d 886, 887 (Ky. App. 1977). Nothing in this statement of purpose demands absolute perfection in jury instructions. The error herein did not affect the verdict, nor did it prevent the jury from fulfilling its fact-finding role. The instruction, as written, held Shirkey to the same degree of care and skill expected of a reasonably competent physician specializing in both ophthalmology **and** vitreoretinal surgery, not a reasonably competent physician specializing in ophthalmology **or** vitreoretinal surgery. Therefore, the jury was charged with determining whether Shirkey met two standards of care. And, despite the lack of a formal certification for vitreoretinal surgery, there is no doubt that including an

additional practice area, especially a surgical specialty, resulted in Shirkey being held to a higher standard than a general ophthalmologist.

Since Shirkey was found to have successfully met this arguably elevated standard, it is illogical to argue that she would have failed to meet an arguably lower one—the standard of care required of a reasonably competent physician specializing in ophthalmology alone. Further, Smith's complaint that the instruction led the jury to extend Shirkey extra respect and credibility is also unpersuasive. Shirkey testified at length about her education, qualifications, and professional experience at trial, and her entire curriculum vitae was admitted into evidence for the jury's review. It seems unlikely the wording of a single jury instruction would form the basis of the jury's opinion after they had already been privy to this in-depth information regarding Shirkey's credentials. Smith failed to establish the instruction as written was prejudicial to her case, and there is no reasonable possibility that the inclusion of the words vitreoretinal surgery affected the ultimate outcome of the case. Therefore, to the extent that the reference to vitreoretinal surgery in the jury instruction constituted error, it was harmless.

## II. Exclusion of Evidence

The trial court excluded limited portions of Dr. Tanner's testimony from jury consideration pursuant to Kentucky Rules of Evidence ("KRE") 401 and 403. KRE 401 defines relevant evidence as "evidence having any tendency to

make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

The specific testimony excluded from trial pertained to Dr. Tanner's business relationships with Dr. Thomas Abell and the Abell Eyes and RAK medical practice groups, as well as his participation in a pre-trial interview with defense counsel. Smith argues that the jury should have had access to this information because it called Dr. Tanner's motives and credibility into question.

Dr. Tanner was initially hired by and worked for Dr. Abell. He later bought, and currently owns, the Abell Eyes medical practice group, now called Precision Eyes. He still practices ophthalmology there and routinely refers patients with retina issues to RAK. He does not make referrals to specific physicians at RAK but sends patients to whomever is available. Additionally, Dr. Tanner was aware that Shirkey's defense counsel represented Dr. Abell in a separate matter and knew the attorney's name. The trial court excluded Dr. Tanner's testimony about these facts from evidence. Smith claims that these facts constitute pre-

existing relationships that invest Dr. Tanner in protecting Shirkey's professional reputation and cast doubt on his ability to testify truthfully about Smith's case.

Abell Eyes and RAK are distinct business entities that do not share office space, staff, resources, or funding sources. Dr. Tanner testified that the relationships between himself, Abell Eyes, RAK, and the physicians and staff who work for both groups are all business relationships, not personal in nature. In response to a question from defense counsel, he agreed that it was important to maintain a good working relationship between Abell Eyes and RAK. Smith pointed to that answer as proof of Dr. Tanner's biases and motivations, but that statement is simply an acknowledgement of the business reality of practicing medicine in a mid-size city. There are only two sizable retina practices in Lexington: RAK and the University of Kentucky eye clinic; it would be routine for Dr. Tanner to maintain good working relationships with both. Also, Abell Eyes, as a general ophthalmology practice, typically refers patients to RAK, a specialty practice. The opposite arrangement is far less common. Thus, there is no evidence that Abell Eyes would sustain a marked decrease in business if one of their doctors disagreed with an RAK doctor about a case. Finally, the fact that Dr. Tanner remembered that Shirkey's counsel had represented Dr. Abell in the past does not appear particularly relevant. Dr. Abell was not a party to this action, he did not testify for either side, and he no longer works with Dr. Tanner.

Dr. Tanner enjoyed customary professional relationships with colleagues, valued cordial working relationships with other medical practices, and recalled that a local attorney had represented a former employer. Further, Smith offered no evidence that a verdict against Shirkey would adversely affect Dr. Tanner's relationships with RAK, Dr. Abell, or any other coworker or colleague, nor would it negatively impact Dr. Tanner's own reputation or financial well-being. Absent a more consequential degree of connection, these facts alone are not particularly probative of bias on the part of Dr. Tanner.

Turning to Dr. Tanner's pre-trial interview with Shirkey's counsel, the first fact to consider is that it was done in accordance with a Qualified HIPAA Protective Order obtained from the trial court during discovery.[1] The order permitted Shirkey's attorney to engage in limited *ex parte* discussions with Smith's treating physicians. It placed parameters on the use and dissemination of Smith's protected health information to preserve her privacy as much as possible while facilitating pre-trial discovery.

Defense counsel contacted Dr. Tanner, informed him of the court order, and asked if he would be willing to answer questions about his treatment of Smith on June 4, 2021. Dr. Tanner agreed and spoke with defense counsel on one occasion—without first consulting or advising Smith. During Dr. Tanner's

---

[1] *See* Qualified HIPAA Protective Order dated December 22, 2022.

-11-

deposition, Smith's counsel questioned him about this interaction and implied that Dr. Tanner had acted unethically.  The trial court excluded this portion of the deposition.  Smith argues that Dr. Tanner's willingness to discuss her case without her permission reflects on his credibility and was "essential" for the jury's consideration.

Trial courts exercise broad discretion on evidentiary matters, and they do so on a case-by-case basis.  Under KRE 403, trial courts must balance the probative value of contested evidence against any prejudice it may elicit.  They also must weigh the probative value of any evidence against its potential for creating confusion or misleading the jury.  "Confusion of the issues is generally used to exclude evidence that creates side issues that distract jurors from the real issues of the case." *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 715 (Ky. 2009) (internal quotation marks and citations omitted).  "Misleading the jury refers primarily to the possibility of the jury overvaluing the probative value of a particular item of evidence for reasons other than the emotional reaction associated with unfair prejudice." *Id.* (internal quotation marks and citation omitted).

Here, while some of the excluded testimony might arguably have been relevant as sources of potential bias on Dr. Tanner's part, its inclusion could also have confused or misled the jury.  Dr. Tanner did have an *ex parte* conversation with defense counsel about Smith's care—but it was authorized by a court order.

Suggesting this discussion between Dr. Tanner and defense counsel was somehow nefarious risked confusing or misleading the jury in addition to being prejudicial to Shirkey.

Similarly, Dr. Tanner did have long-standing business connections to Dr. Abell and had some awareness of Dr. Abell's involvement in an unrelated lawsuit—where the latter was represented by Shirkey's same counsel. But Dr. Abell was a non-party in this lawsuit and was not called as a witness at trial. As such, the probative value of this information involving Dr. Abell was limited compared with its potential to create side issues that would "distract jurors from the real issues of the case." *Brooks*, 283 S.W.3d at 715. And while we acknowledge another trial judge might have drawn the exclusion line on this evidence in a different place, we cannot say the circuit court's Rule 403 balancing decision here was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.

## CONCLUSION

For the reasons set forth above, the Fayette Circuit Court's verdict and judgment is hereby AFFIRMED.

ALL CONCUR.

BRIEFS FOR APPELLANT:

D. Seth Coomer
Lexington, Kentucky

BRIEF FOR APPELLEES:

Jonathan D. Weber
Ellen L. Black
Lexington, Kentucky